IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BYBIT TECHNOLOGY LIMITED,**<br><br>        Plaintiff,<br><br>   v.<br><br>**DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA; DPRK RECONNAISSANCE GENERAL BUREAU; LAZARUS GROUP; and JOHN DOES 1-20,**<br><br>        Defendants. | Case No. |

**PLAINTIFF BYBIT TECHNOLOGY LIMITED'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING <u>ORDER AND EXPEDITED DISCOVERY</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 10

BACKGROUND ...................................................................................................... 13

    A. Bybit Operates One of the World's Largest Cryptocurrency Exchanges. ............. 13

    B. The February 21, 2025 Attack. ..................................................................... 14

    C. The Federal Bureau of Investigation Publicly Attributes the Attack to the
       Lazarus Group. ........................................................................................... 16

    D. Bybit Kept Its Customers Whole at Enormous Cost to Itself. ............................ 17

    E. Forensic Tracing Identifies the Specific Stolen Funds and the Wallets
       Currently Holding Them. ................................................................................ 18

    F. The Doe Defendants Continue to Move and Launder the Stolen Funds. ............... 19

    G. Law Enforcement Has Preserved a Portion—But Only a Portion—of the
       Stolen Funds. ............................................................................................... 20

JURISDICTION AND VENUE ................................................................................. 21

LEGAL STANDARD ............................................................................................... 21

ARGUMENT ........................................................................................................... 22

I. BYBIT IS LIKELY TO SUCCEED ON THE MERITS. ........................................... 22

    A. The Doe Defendants Violated the Computer Fraud and Abuse Act .................... 23

    B. The Doe Defendants Engaged in a Pattern of Racketeering Activity. ................. 24

    C. The Doe Defendants Converted Bybit's Property. .......................................... 27

    D. The Doe Defendants Have Been Unjustly Enriched at Bybit's Expense. ............. 28

    E. The Doe Defendants Committed Fraud Against Bybit. ..................................... 29

    F. The Court Should Impose a Constructive Trust Over the Stolen
       Cryptocurrency. ........................................................................................... 30

    G. Bybit Is Entitled to Replevin of the Specific Stolen Cryptocurrency. ................. 31

    H. The Doe Defendants Tortiously Interfered With Bybit's Customer
       Relationships. .............................................................................................. 32

II. BYBIT WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE
    RELIEF. ............................................................................................................. 33

    A. The Doe Defendants Are Actively Dissipating the Specific Assets That
       Were Stolen in the Theft. ............................................................................... 33

    B. Restraining the Assets Is the Only Mechanism That Will Allow Recovery
       of the Stolen Property. ................................................................................... 35

    C. Monetary Damages Are an Inadequate Remedy. ............................................. 36

III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR
    EMERGENCY RELIEF. ...................................................................................... 37

## TABLE OF CONTENTS
(continued)

Page

A. The Balance of Equities Tips Sharply Toward Bybit. ...........................................37

B. The Public Interest Decisively Favors Relief. ......................................................38

IV. THE COURT SHOULD ENTER RELIEF WITHOUT NOTICE. ...................................41

A. Notice Cannot Be Given to Anonymous Defendants Who Operate Through Pseudonymous Wallets. ...................................................................................................41

B. Providing Notice Would Itself Trigger the Dissipation the Order Is Designed to Prevent. ..............................................................................................42

C. Bybit Will Effectuate Service of the Order Promptly After Entry. .......................43

V. THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR SET A NOMINAL BOND. ...............................................................................................................45

VI. THE COURT SHOULD ORDER EXPEDITED DISCOVERY TO IDENTIFY THE DOE DEFENDANTS AND TRACE ADDITIONAL STOLEN ASSETS. ......................................................................................................................45

A. Good Cause Supports Expedited Discovery to Identify the Doe Defendants. ......46

B. Good Cause Independently Exists to Support the Requested Preliminary Relief. ...............................................................................................................47

C. The Stolen Asset Base Is Dynamic and Continues to Move. ...............................48

D. The Requested Discovery Is Narrowly Tailored and Will Not Impose Undue Burden. ..................................................................................................49

E. Proposed Scope of Expedited Discovery. .........................................................49

CONCLUSION. .........................................................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Records LLC v. Does 1-19,*
  551 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................... 45

*Astrove v. Doe,*
  No. 9:22-cv-80614, slip op. (S.D. Fla. Apr. 20, 2022) ....................................... *passim*

*Attkisson v. Holder,*
  113 F. Supp. 3d 156 (D.D.C. 2015) ............................................................................... 47

*Bennett v. Kiggins,*
  377 A.2d 57 (D.C. 1977) ................................................................................................ 28

*Bolle v. Hume,*
  619 A.2d 1192 (D.C. 1993) ............................................................................................ 29

*Boyle v. United States,*
  556 U.S. 938 (2009) ....................................................................................................... 24

*Casco Marina Dev., L.L.C. v. D.C. Redev. Land Agency,*
  834 A.2d 77 (D.C. 2003) ................................................................................................ 31

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 21, 32

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz,*
  793 F. Supp. 2d 311 (D.D.C. 2011) ............................................................................... 26

*Daisley v. Riggs Bank, N.A.,*
  372 F. Supp. 2d 61 (D.D.C. 2005) ................................................................................. 28

*De Beers Consol. Mines, Ltd. v. United States,*
  325 U.S. 212 (1945) ....................................................................................................... 21

*Deegan v. Strategic Azimuth LLC,*
  768 F. Supp. 2d 107 (D.D.C. 2011) ............................................................................... 30

*Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.,*
  234 F.R.D. 4 (D.D.C. 2006) ...................................................................................... 46, 47

*District Title v. Warren,*
  181 F. Supp. 3d 16 (D.D.C. 2014) ................................................................................. 27

*Facebook, Inc. v. Power Ventures, Inc.,*
  252 F. Supp. 3d 765 (N.D. Cal. 2017) ........................................................................... 23

*In re Fannie Mae Derivative Litig.,*
  227 F.R.D. 142 (D.D.C. 2005) .................................................................................. 44, 46

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*Fiber Sys. Int'l, Inc. v. Roehrs*,
  470 F.3d 1150 (5th Cir. 2006) ...................................................... 23

*Google LLC v. Does 1-25 ("Lighthouse Enterprise")*,
  No. 1:25-cv-09421 (S.D.N.Y. Dec. 1, 2025) ................................. 24

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*,
  527 U.S. 308 (1999) ..................................................................... 21

*Gucci Am., Inc. v. Bank of China*,
  768 F.3d 122 (2d Cir. 2014) ......................................................... 37

*Guttenberg v. Emery*,
  26 F. Supp. 3d 88 (D.D.C. 2014) .................................................. 46

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*,
  530 U.S. 238 (2000) ..................................................................... 29

*United States ex rel. Hawkins v. ManTech Int'l Corp.*,
  752 F. Supp. 3d 118 (D.D.C. 2024) .............................................. 25

*Hertz v. Klavan*,
  374 A.2d 871 (D.C. 1977) ....................................................... 27, 29

*Hunt v. DePuy Orthopaedics, Inc.*,
  729 F. Supp. 2d 231 (D.D.C. 2010) .............................................. 30

*Jacobo v. Doe*,
  No. 1:22-cv-00672, 2022 WL 2052637 (E.D. Cal. June 7, 2022) ............................... *passim*

*JSC Transmashholding v. Miller*,
  70 F. Supp. 3d 516 (D.D.C. 2014) ................................................ 27

*Kaempe v. Myers*,
  367 F.3d 958 (D.C. Cir. 2004) ...................................................... 30

*LCX AG v. John Does Nos. 1-25*,
  No. 154644/2022 (N.Y. Sup. Ct. June 2, 2022) ....................... 42, 43

*Legacy Invs. Holdings, LLC v. John Does 1-20*,
  No. 3:25-cv-08800 (N.D. Cal. Nov. 7, 2025) ............................. *passim*

*Liu v. Project Invs., Inc.*,
  No. 9:16-cv-80060 (S.D. Fla. June 4, 2021) .................................. 35

*Mac'Avoy v. Smithsonian Inst.*,
  757 F. Supp. 60 (D.D.C. 1991) ..................................................... 30

*McNamara v. Picken*,
  950 F. Supp. 2d 193 (D.D.C. 2013) .............................................. 26

## TABLE OF AUTHORITIES
### continued

Page(s)

*Microsoft Corp. v. Does 4-10 Operating an Azure Abuse Network,*
No. 1:24-cv-02323 (E.D. Va. Dec. 19, 2024) ................................................................... 24

*News World Commc'ns, Inc. v. Thompsen,*
878 A.2d 1218 (D.C. 2005) ................................................................ 27

*Papageorge v. Zucker,*
169 A.3d 861 (D.C. 2017) ................................................................ 26

*Regal Knitwear Co. v. NLRB,*
324 U.S. 9 (1945) ................................................................ 37

*Reno Air Racing Ass'n, Inc. v. McCord,*
452 F.3d 1126 (9th Cir. 2006) ................................................................ 41, 42

*Sedima, S.P.R.L. v. Imrex Co.,*
473 U.S. 479 (1985) ................................................................ 23

*Semitool, Inc. v. Tokyo Electron Am., Inc.,*
208 F.R.D. 273 (N.D. Cal. 2002) ................................................................ 46

*Shea v. Fridley,*
123 A.2d 358 (D.C. 1956) ................................................................ 26

*Shelley v. Am. Postal Workers Union,*
775 F. Supp. 2d 197 (D.D.C. 2011) ................................................................ 20, 46

*Stankevich v. Kaplan,*
156 F. Supp. 3d 86 (D.D.C. 2016) ................................................................ 24

*Strike 3 Holdings, LLC v. Doe,*
No. 18-806, 2018 WL 3344631 (D.D.C. July 9, 2018) ................................................................ 45

*United States v. All Assets Held at Bank Julius Baer & Co.,*
772 F. Supp. 2d 191 (D.D.C. 2011) ................................................................ 27

*United States v. Harmon,*
474 F. Supp. 3d 76 (D.D.C. 2020) ................................................................ 17, 26

*United States v. Richardson,*
167 F.3d 621 (D.C. Cir. 1999) ................................................................ 24

*United States v. Sterlingov,*
No. 21-cr-399 (D.D.C. Mar. 6, 2023) ................................................................ 33

*Van Loon v. Dep't of the Treasury,*
122 F.4th 549 (5th Cir. 2024) ................................................................ 33

*In re Vuitton et Fils S.A.,*
606 F.2d 1 (2d Cir. 1979) ................................................................ 42

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

*WhatsApp Inc. v. NSO Group Techs. Ltd.*,
  No. 4:19-cv-07123 (N.D. Cal. Oct. 17, 2025) ................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 20, 35, 37

*Yegiazaryan v. Smagin*,
  599 U.S. 533 (2023) ................................................................................ 24, 25

*Yogaratnam v. Doe*,
  No. 2:24-cv-00393 (E.D. La. Feb. 23, 2024) ........................................... *passim*

**Statutes**

18 U.S.C.
  § 981 .............................................................................................. 11, 19
  § 1030(a)(4) ........................................................................................... 22
  § 1030(e)(2)(B) ................................................................................ 22, 23
  § 1030(g) ............................................................................................ 23, 24
  § 1343 ................................................................................................... 23
  § 1956 ................................................................................................... 23
  § 1961 ......................................................................................... *passim*
  § 1961(1) .............................................................................................. 23

28 U.S.C.
  § 1331 ................................................................................................... 19
  § 1367(a) .............................................................................................. 19
  § 1391(b)(2) .......................................................................................... 20
  § 1608 ..................................................................................................... 9

50 U.S.C. § 1701 *et seq.* (International Emergency Economic Powers Act) .......................... 38

D.C. Code
  § 16-3701 .............................................................................................. 30
  § 16-3702 .............................................................................................. 30

Fed. R. Civ. P.
  26(d)(1) ................................................................................................. 44
  26(f) ................................................................................................. 44, 46
  45 .................................................................................................. 54, 55
  65(b)(1) ......................................................................................... *passim*
  65(c) .......................................................................................... 43, 44, 49
  65(d)(2) ................................................................................................ 36
  65(d)(2)(C) ...................................................................................... 42, 43

**Rules and Regulations**

31 C.F.R. Part 501 ........................................................................................... 34

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

31 C.F.R.
 § 1010.100(ff)(5) ........................................................................................ 45
 § 1022.210 ................................................................................................... 45

D.D.C. Local Civil Rule 65.1 ............................................................................ 40

Exec. Order No. 14233, 90 Fed. Reg. 11,789 (Mar. 6, 2025) ........................... 38

Exec. Order No. 13687, 80 Fed. Reg. 819 (Jan. 2, 2015).................................. 38

**Other Authorities**

11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2952 (3d
 ed. 2012) ..................................................................................................... 42

*Cyber-Related Designations; North Korea Designations and Designation Up-
 date; Belarus Designations Removals; Issuance of Belarus General Li-
 cense*, OFF. OF FOREIGN ASSETS CONTROL (Nov. 4, 2025),
 https://ofac.treasury.gov/recent-actions/20251104 [https://perma.cc/4DQJ-
 GLVC] ....................................................................................................... 16

Elliptic, *The Rise and Fall of eXch: The Dark Service Used by North Korea to
 Launder $200 Million Stolen from Bybit*, (Apr. 30, 2025), https://www.el-
 liptic.co/blog/the-rise-and-fall-of-exch-the-dark-service-used-by-north-ko-
 rea-to-launder-200-million-stolen-from-bybit [https://perma.cc/DA7U-
 VA22] ........................................................................................................ 19

FinCEN, *Guidance FIN-2019-G001: Application of FinCEN's Regulations to
 Certain Business Models Involving Convertible Virtual Currency* (May 9,
 2019)........................................................................................................... 45

*PSA250226—North Korea Responsible for $1.5 Billion Bybit Hack*, FED. BU-
 REAU OF INVESTIGATION, INTERNET CRIME COMPLAINT CTR. (Feb. 26,
 2025), https://www.ic3.gov/PSA/2025/PSA250226
 [https://perma.cc/863C-JZBK] .................................................................. 16

Restatement (Third) of Restitution and Unjust Enrichment § 55 (Am. Law
 Inst. 2011) .................................................................................................. 36

Sygnia, *Sygnia's Investigation into the Bybit Hack: What We Know So Far*
 (Mar. 16, 2025), https://www.sygnia.co/blog/sygnia-investigation-bybit-
 hack/ [https://perma.cc/6CEY-Q7EX] ....................................................... 15

*Treasury Sanctions DPRK Bankers and Institutions Involved in Laundering
 Cybercrime Proceeds and IT Worker Funds*, U.S. DEP'T OF THE TREASURY
 (Nov. 4, 2025), https://home.treasury.gov/news/press-releases/sb0302
 [https://perma.cc/7Y2F-DB23]................................................................... 16

**TABLE OF AUTHORITIES**
**continued**

**Page(s)**

TRM Labs, *eXch Remains Active Despite Shutdown: How the Bybit Hack-Linked Exchange Continues to Enable Laundering*, (May 2, 2025), https://www.trmlabs.com/resources/blog/exch-remains-active-despite-shutdown-how-the-bybit-hack-linked-exchange-continues-to-enable-laundering-of-csam-funds [https://perma.cc/5FFC-3X4B] ...................................................... 19

## INTRODUCTION

On February 21, 2025, the Lazarus Group—a state-sponsored cyber threat actor directed by the Democratic People's Republic of Korea—and the John Doe Defendants executed the largest single cryptocurrency theft in recorded history. In a single coordinated attack, carried out in a matter of minutes through a supply-chain compromise of a third-party software provider, the perpetrators redirected approximately $1.5 billion in Ethereum from a Bybit-controlled cold wallet to a network of wallets they controlled. Within six days, the Federal Bureau of Investigation (FBI) publicly attributed the theft to the Lazarus Group, confirming what independent forensic analysts had already concluded. The Bybit theft was not an isolated event: through April 2026, DPRK-affiliated actors have been responsible for approximately 76% of all cryptocurrency stolen globally, and the pace of attacks is accelerating. Since the February 21 attack, the perpetrators have laundered the stolen funds through cryptocurrency mixers, decentralized exchanges, and cross-chain bridges in a sustained, ongoing effort to obscure the funds' origin and place them beyond the reach of legal process. As of the date of this Motion, that laundering effort continues—and with each passing day, the traceable proceeds move closer to irretrievable form.

This Motion seeks a temporary restraining order narrowly targeted at preserving only the specific stolen assets traceable—wallet by wallet, transaction by transaction—to the February 21, 2025 theft. The relief is narrowly tailored. Plaintiff requests relief only as to John Doe Defendants—the natural persons operating the wallets identified in Exhibit A.[1] And it

---

[1] Plaintiff is concurrently effectuating service on Defendants Democratic People's Republic of Korea, the Reconnaissance General Bureau, and Lazarus Group pursuant to 28 U.S.C. § 1608. Plaintiff does not seek injunctive relief against those Defendants in this Motion.

reaches only the specific assets identified by forensic blockchain analysis as traceable to the theft.

The case for emergency relief is straightforward. Defendants are anonymous. The funds are moving. Bybit asks the Court to restrain the Doe Defendants—and any person acting in active concert or participation with them—from transferring, dissipating, or otherwise disposing of the specific stolen cryptocurrency identified in Exhibit A pending adjudication of Bybit's claims for return of that property. Absent such preservation, the continued laundering activity will place the traceable proceeds beyond the reach of any meaningful relief. Federal courts have repeatedly recognized that the speed and pseudonymity of cryptocurrency transactions, combined with the use of cross-chain bridges and mixing services, render traditional post-judgment collection mechanisms inadequate to recover stolen digital assets. *See, e.g., Yogaratnam v. Doe*, No. 2:24-cv-00393 (E.D. La. Feb. 23, 2024) (entering *ex parte* TRO over cryptocurrency proceeds); *Jacobo v. Doe*, No. 1:22-cv-00672, 2022 WL 2052637 (E.D. Cal. June 7, 2022) (same); *Legacy Invs. Holdings, LLC v. John Does 1-20*, No. 3:25-cv-08800 (N.D. Cal. Nov. 7, 2025) (same, in $28 million crypto-theft case).

For Bybit, the stakes of this Motion are concrete. Bybit, an operator of one of the world's largest cryptocurrency exchanges, kept every affected customer whole following the February 21 attack, at enormous cost to itself. The company met more than $4 billion in customer withdrawal demands in the twelve hours following the theft and secured emergency bridge financing to do so. It deployed crisis-management resources, launched the LazarusBounty program to incentivize public assistance with recovery, and absorbed more than a billion dollars in losses that customers would otherwise have borne. The specific assets identified in Exhibit A are traceable to the February 21 theft through blockchain forensic analysis described in the accompanying Declaration of Alan Xin submitted in support of this

11

Motion ("Xin Decl."). *See* Xin Decl. ¶¶ 30–32. If those assets dissipate further, there will be no viable avenue for the recovery of the stolen property itself.

A temporary restraining order is the only mechanism that can preserve those assets pending resolution of this case. The FBI has obtained one or more seizure warrants under 18 U.S.C. § 981, and foreign law enforcement has informally facilitated the freezing of additional tranches at various cryptocurrency exchanges, and additional assets have been recovered or voluntarily frozen by cooperating exchanges. But those preservation and recovery efforts— even combined—account for just 5.3% of the stolen funds, leaving more than $1.4 billion subject to no preservation mechanism whatsoever. They do not reach assets held at exchanges outside the practical reach of U.S. process. And the informal freezes—which rest on the voluntary cooperation of private exchanges, not on court order—may be lifted at any time before adjudication.

The Motion should be granted for four reasons:

*First*, Bybit is likely to succeed on the merits. Acting through a coordinated criminal enterprise, the Doe Defendants engaged in unauthorized access to Bybit's systems in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; converted Bybit's property in violation of common law; were unjustly enriched at Bybit's expense; defrauded Bybit's wallet-signing infrastructure; engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961–1968; and—through the subset of Doe Defendants who currently control the wallets identified in Exhibit A—continue to wrongfully detain the specific stolen property that Bybit is entitled to recover. The federal government has independently and publicly attributed the underlying conduct to the Lazarus Group, foreclosing any serious dispute about the identity of the wrongdoers or the wrongful character of their conduct.

*Second*, Bybit will suffer irreparable harm absent immediate relief. The Doe Defendants have been actively moving the stolen funds through laundering channels since the cyber theft.

The filing of this action will undoubtedly accelerate those efforts. Each time Bybit's stolen crypto passes through a mixer or cross-chain bridge, it degrades the blockchain forensic trail and increases the risk that the traceable proceeds will pass into venues beyond the practical reach of U.S. or cooperative-foreign-jurisdiction process.

*Third*, the balance of equities likewise favors Bybit. The Doe Defendants are anonymous actors holding stolen property. They have no legitimate property interest in the cryptocurrency identified in Exhibit A and cannot, as a matter of law, suffer cognizable harm from being temporarily restrained from disposing of stolen funds.

*Fourth*, the public interest weighs in favor of relief. The funds at issue were stolen by a state-sponsored cyber threat actor to finance the DPRK regime's weapons of mass destruction program in violation of the United States sanctions regime and United Nations Security Council resolutions. Allowing those funds to continue moving toward DPRK control while this litigation proceeds would frustrate both the private remedial interests vindicated by this action and the substantial public interests in sanctions enforcement and counterproliferation.

For these reasons, and as set forth more fully below, this Court should issue the proposed temporary restraining order on an *ex parte* basis. Time is the dispositive variable: every day the order does not issue is a day the Lazarus Group's laundering apparatus operates without judicial constraint. Bybit further requests that the Court enter the accompanying Order to Show Cause why a preliminary injunction should not issue as to the John Doe Defendants, with a hearing scheduled within the fourteen-day window contemplated by Rule 65(b)(2).

## BACKGROUND

### A. Bybit Operates One of the World's Largest Cryptocurrency Exchanges.

Bybit was founded in late 2018 by Chief Executive Officer Ben Zhou, a former foreign-exchange and investment-banking professional, with the vision of building a next-generation

13

cryptocurrency exchange that combined institutional-grade infrastructure with accessibility for everyday users. Zhou and his co-founders launched Bybit's first product—a Bitcoin inverse perpetual contract—in December 2018. Within a year, the platform was processing roughly 10% of global Bitcoin trading volume. By 2020, Bybit had surpassed $4 billion in daily trading volume; by 2021, daily trading volume exceeded $70 billion as the company diversified its product offerings and its customer base grew by millions of users each year. By 2024, Bybit had over 40 million users worldwide and had become the world's second-largest cryptocurrency exchange. As of the date of this Motion, Bybit serves more than 80 million users worldwide and processes an average daily trading volume in excess of $10 billion.

To meet its custodial obligations to those customers, Bybit holds customer cryptocurrency in a combination of hot wallets, used for active trading and withdrawals, and cold wallets, used for long-term storage and kept disconnected from networked systems for security purposes. The cold wallets are the highest-security tier of Bybit's infrastructure, and the cold-wallet signing process requires multi-party authorization—a process commonly known as "multisig"—before any transfer can be executed. Xin Decl. ¶ 6. The multisig process is designed to ensure that no single individual can approve a transaction.

### B. The February 21, 2025 Attack.

On February 21, 2025, Bybit attempted to execute a routine internal transfer of Ethereum (ETH) from one of its cold wallets to a warm wallet. Xin Decl. ¶ 9. Three Bybit executives were required to digitally approve the transfer through the multisig process described above. Xin Decl. ¶ 13. The Doe Defendants exploited that process by manipulating the transfer addresses presented to those executives so that the authorized transaction—as displayed on the executives' screens—appeared to be a normal transfer to the correct destination, when in fact the funds were being redirected to wallets controlled by the Doe Defendants. Xin Decl. ¶¶ 12, 14.

14

The intrusion that culminated in the February 21, 2025 theft began on or about February 4, 2025, when the Doe Defendants compromised the workstation of a software developer at Safe{Wallet}—the third-party platform Bybit relied on to manage its multisig cold-wallet transactions—through a social-engineering attack, and used that foothold to obtain access to Safe{Wallet}'s cloud infrastructure.[2] By on or about February 18, 2025, the Doe Defendants had reached Safe{Wallet}'s cloud-hosted infrastructure. Xin Decl. ¶ 11. Bybit's forensic investigators determined that the attackers gained unauthorized access to a Safe{Wallet} Amazon Web Services account and associated API credentials, and used that access to deploy malicious code to the Safe{Wallet} infrastructure on which Bybit's authorized signers relied. Xin Decl. ¶ 11. Having corrupted the platform that stood between Bybit's signers and its cold wallet, the attackers were positioned to manipulate the very transaction-approval process Bybit used to safeguard its assets. Xin Decl. ¶ 12.

Once inside Safe{Wallet}'s systems, the Doe Defendants replaced legitimate JavaScript resources served by the Safe{Wallet} interface with malicious versions specifically designed to activate when Bybit's particular wallets initiated a transaction. Xin Decl. ¶ 12. When Bybit's executives went to approve the routine February 21 transfer, their screens displayed what appeared to be a normal transaction sending funds to the correct destination. In reality, the malicious code caused the signers to unknowingly approve an unauthorized upgrade of Bybit's cold-wallet smart contract to a malicious implementation contract that the attackers had pre-deployed and that contained concealed backdoor functions. Xin Decl. ¶ 14. The Doe Defendants then invoked those backdoor functions to drain the wallet, transferring its contents to wallets under their control. The unauthorized transfer was executed in a single coordinated sequence and was complete within minutes. Xin Decl. ¶ 14. Approximately $1.5 billion in

---

[2] *See* Sygnia, *Sygnia's Investigation into the Bybit Hack: What We Know So Far* (Mar. 16, 2025), https://www.sygnia.co/blog/sygnia-investigation-bybit-hack/ [https://perma.cc/6CEY-Q7EX].

Ethereum and Ethereum-based digital assets was taken—comprising approximately 401,347 ETH, 90,375 stETH, 8,000 mETH, 15,000 cmETH, and 90 USDT—based on market values at the time of the theft. Xin Decl. ¶¶ 7, 17. The attack was, by any measure, the largest single cryptocurrency theft on record.

### C. The Federal Bureau of Investigation Publicly Attributes the Attack to the Lazarus Group.

On February 26, 2025, the FBI issued IC3 Public Service Announcement 250226 (the "PSA"), publicly attributing the February 21 attack to "TraderTraitor," a cyber threat actor identified by the FBI as a subgroup of the Lazarus Group operating at the direction of the Democratic People's Republic of Korea.[3] The PSA identified specific blockchain addresses associated with the attack and called on cryptocurrency exchanges, blockchain analytics providers, and the public to assist in tracing and freezing the stolen funds. *Id.*

The FBI's attribution is corroborated both by other federal agencies and by independent private-sector sources. The United States Department of the Treasury designated a network of DPRK banking officials, front companies, and fifty-three cryptocurrency addresses on November 4, 2025 for laundering proceeds of cybercrime on behalf of the DPRK regime, expressly identifying the February 21, 2025 Bybit theft as part of the broader pattern of DPRK cybercrime addressed by the designation.[4] On March 12, 2026, Treasury expanded those

---

[3]*PSA250226—North Korea Responsible for $1.5 Billion Bybit Hack*, FED. BUREAU OF INVESTIGATION, INTERNET CRIME COMPLAINT CTR. (Feb. 26, 2025), https://www.ic3.gov/PSA/2025/PSA250226 [https://perma.cc/863C-JZBK].

[4]*Treasury Sanctions DPRK Bankers and Institutions Involved in Laundering Cybercrime Proceeds and IT Worker Funds*, U.S. Dep't of the Treasury (Nov. 4, 2025), https://home.treasury.gov/news/press-releases/sb0302 [https://perma.cc/7Y2F-DB23]; *Cyber-Related Designations; North Korea Designations and Designation Update; Belarus Designations Removals; Issuance of Belarus General License*, Off. of Foreign Assets Control (Nov. 4, 2025), https://ofac.treasury.gov/recent-actions/20251104 [https://perma.cc/4DQJ-GLVC].

designations, adding six individuals, two entities, and an additional twenty-one cryptocurrency addresses associated with DPRK's information-technology-worker and cryptocurrency-laundering operations.[5]

Independent private-sector sources separately confirm the attribution. The cybersecurity firms Sygnia and Verichains independently concluded that the conduct bears the technical hallmarks of Lazarus Group operations and is consistent with prior DPRK-attributed cryptocurrency thefts. Xin Decl. ¶ 25. In addition, one of the cryptocurrency exchanges through which a portion of the stolen funds was routed has independently confirmed in the course of a law enforcement investigation by the United Arab Emirates that at least eight Tron-network wallet addresses previously identified through forensic tracing as connected to the hack are commonly owned by a single user, corroborating centralized control of the laundering operation. Xin Decl. ¶ 26.

### D. Bybit Kept Its Customers Whole at Enormous Cost to Itself.

In the hours following the February 21 attack, Bybit faced an extraordinary run on customer withdrawals. Within twelve hours of the theft, Bybit received and honored more than $4 billion in customer withdrawal requests. Xin Decl. ¶ 18. To meet that demand, Bybit secured emergency bridge financing, deployed crisis-management resources across its global operations, and absorbed approximately $1.5 billion in direct losses that customers would otherwise have borne. Xin Decl. ¶ 19. No Bybit customer lost funds as a result of the attack.

Bybit also launched the LazarusBounty program, a public-facing initiative to incentivize blockchain investigators and the broader cryptocurrency community to assist in tracing and recovering the stolen funds. Xin Decl. ¶ 21. The program has produced substantial

---

[5] *Cyber-Related Designations; North Korea Designations and Designation Update; Belarus Designations Removals; Issuance of Belarus General License*, Off. of Foreign Assets Control (Nov. 4, 2025), https://ofac.treasury.gov/recent-actions/20251104 (last visited June 14, 2026).

public-source tracing data that complements the work of professional forensic analysts retained by Bybit and the cooperative efforts of law enforcement. *Id.*

### E. Forensic Tracing Identifies the Specific Stolen Funds and the Wallets Currently Holding Them.

In the months following the attack, professional blockchain forensic analysts, working in coordination with law enforcement and with Bybit's internal investigations teams, traced the stolen Ethereum and its converted proceeds across the public blockchain ledger. Xin Decl. ¶¶ 30–32. The results are reflected in Exhibit A to this Motion, which identifies each wallet address presently believed to hold cryptocurrency traceable to the February 21, 2025 theft, together with the asset type and amount held, and the cryptocurrency exchange or service provider with which each wallet is believed to be held. Xin Decl. ¶¶ 32–33.

The tracing methodology rests on the public nature of the blockchain ledger. Each transfer of cryptocurrency from one wallet to another is recorded on-chain and is publicly verifiable. *See United States v. Harmon*, 474 F. Supp. 3d 76, 90 (D.D.C. 2020) (describing the blockchain as "a public ledger that records every bitcoin transaction" and noting that every node in the network maintains "a current, immutable history of all transactions ever logged on the blockchain"). By identifying the wallets that initially received the stolen funds on February 21, 2025, and tracing each subsequent transfer of those funds—including transfers across blockchains through cross-chain bridges, conversions between cryptocurrencies through decentralized exchanges, and movements through cryptocurrency mixers—the forensic analysts have constructed a comprehensive map of the laundering activity. Xin Decl. ¶ 31. The wallets identified in Exhibit A are where that traceable property is held today. They hold cryptocurrency that is individually attributable, transaction by transaction, to the February 21 theft.

## F. The Doe Defendants Continue to Move and Launder the Stolen Funds.

The forensic record establishes that the laundering activity has not stopped. Between February 21, 2025 and the date of this Motion, the Doe Defendants have executed thousands of transactions designed to obscure the origin of the stolen funds and to place them beyond the reach of legal process. Xin Decl. ¶ 41.

These transactions include the repeated movement of tranches of the stolen funds, in the period following the theft and continuing through the months preceding this Motion, through cryptocurrency mixers, cross-chain bridges, and swapping services such as eXch. Xin Decl. ¶ 41. The pattern of activity is sustained and ongoing.

Public blockchain-analytics reporting has identified one such laundering channel in particular. The cryptocurrency-swapping service eXch was used to launder a substantial portion of the assets stolen in the February 21, 2025 theft, with public analysts estimating the laundered sum in the hundreds of millions of dollars.[6] On April 30, 2025, law enforcement authorities shut down eXch's operations and seized its server infrastructure and approximately €34 million in crypto assets; however, public reporting indicates that the service continues to facilitate laundering activity following the shutdown.[7] This activity confirms that the stolen funds remain in active circulation through services purpose-built to defeat tracing and to place the assets beyond the reach of legal process. The assets seized in the eXch shutdown included

---

[6] *See* Elliptic, *The Rise and Fall of eXch: The Dark Service Used by North Korea to Launder $200 Million Stolen from Bybit*, (Apr. 30, 2025), https://www.elliptic.co/blog/the-rise-and-fall-of-exch-the-dark-service-used-by-north-korea-to-launder-200-million-stolen-from-bybit [https://perma.cc/DA7U-VA22 ].

[7] *See* TRM Labs, *eXch Remains Active Despite Shutdown: How the Bybit Hack-Linked Exchange Continues to Enable Laundering*, (May 2, 2025), https://www.trmlabs.com/resources/blog/exch-remains-active-despite-shutdown-how-the-bybit-hack-linked-exchange-continues-to-enable-laundering-of-csam-funds [https://perma.cc/5FFC-3X4B ].

19

funds traceable to the February 21, 2025 theft, and Bybit has engaged with the relevant foreign law enforcement authorities, who have indicated a willingness to cooperate in the preservation and recovery of those funds. Xin Decl. ¶ 35.

### G. Law Enforcement Has Preserved a Portion—But Only a Portion—of the Stolen Funds.

In consultation with Bybit, the federal government and foreign law enforcement authorities have taken preservation action against subsets of the stolen funds. The FBI has obtained one or more seizure warrants under 18 U.S.C. § 981. Xin Decl. ¶ 34. Taken together, the FBI and foreign law enforcement (including authorities in the United Arab Emirates) have frozen over $35 million in stolen funds that were traced to the Bybit hack. Xin Decl. ¶ 34. These funds are currently frozen across many crypto companies and exchanges, including Binance, BitMart, Bittime, Bridgers, BTCTurk.com, Chainflip, Changelly, ChangeNow, Circle, Coinbase, Crypto.com, Exness, Gate.io, Heleket, HTX, Kraken, Kanga.exchange, Kucoin, Matrixport, MEXC, N.Exchange, Nexo.io, OKX, Poloniex, Shakepay, ShapeBTC, Swapkit, and Tether. Xin Decl. ¶ 34.

Bybit has also pursued civil enforcement action in foreign jurisdictions to preserve and recover the stolen assets. In April 2025, Bybit applied to the Court of First Instance of the High Court of the Hong Kong Special Administrative Region and obtained two injunctions restraining unknown persons with access to identified wallet addresses from disposing of cryptocurrency traceable to the February 21, 2025 theft. Xin Decl. ¶ 36.

But those preservation efforts are partial and contingent. They reach only a small fraction of the $1.5 billion stolen. They do not extend to assets held at exchanges outside the practical reach of U.S. or cooperative-foreign-jurisdiction process. And they rest substantially on the discretion of the holding exchanges, which—in the absence of formal court process— retain the ability to lift the informal freezes. Xin Decl. ¶ 39.

20

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Bybit's claims arise under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. The Court has supplemental jurisdiction over the related state-law claims under 28 U.S.C. § 1367(a). The Court has personal jurisdiction over the Doe Defendants because the conduct giving rise to Bybit's claims was purposefully directed at the United States: the Doe Defendants compromised computing infrastructure partially hosted in the United States, induced unauthorized transactions on Bybit's wallet-signing systems, and laundered the resulting proceeds through cryptocurrency exchanges with United States operations. Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, and under 28 U.S.C. § 1391(f)(1) and (f)(4) because this is the United States District Court for the District of Columbia.

## LEGAL STANDARD

"The factors that apply in evaluating requests for a TRO are identical to those that apply in evaluating requests for preliminary injunctions." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011). A plaintiff seeking such relief must demonstrate (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A temporary restraining order may issue without notice to the adverse party. The Federal Rules of Civil Procedure authorize the Court to enter such an order where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition,"

21

and where the movant's attorney "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

This authority extends to the pre-judgment restraint of a defendant's assets where the relief sought is preservation of specific, identifiable property in which the movant asserts an equitable interest. Although federal courts lack the equitable authority to enter a pre-judgment freeze of a defendant's general assets to secure an anticipated money judgment, the Supreme Court recognized in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999), that they retain the "inherent equit[able] power" to deal with the property which is the subject of the litigation. *Id.* at 329 (citation modified). The Court grounded that principle in the traditional equity practice the federal courts inherited at the founding: where a plaintiff asserts an equitable claim to specific property in the defendant's hands, courts have always had authority to preserve that property pending adjudication. *Id.* at 319–22; *see De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 222–23 (1945) (recognizing that pre-judgment injunctive relief is available to preserve property that is the subject of the suit). That is precisely the kind of relief Bybit requests here. Bybit does not by virtue of this Motion seek to restrain the Doe Defendants' general assets pending a money judgment. It seeks preservation of the specific, individually traceable cryptocurrency that is the subject of its equitable claims.

## ARGUMENT

## I. BYBIT IS LIKELY TO SUCCEED ON THE MERITS.

No element of Bybit's claims is genuinely contestable. The federal government has publicly attributed the February 21, 2025 attack to DPRK and the Doe Defendants who are associated with DPRK. The blockchain forensic record traces the stolen funds, transaction by transaction, from Bybit's cold wallet to the specific destination addresses identified in Exhibit

22

A. And the underlying conduct violates multiple independent federal and common-law prohibitions, each of which independently supports the requested relief. In sum, Bybit is likely to succeed on its claims against the Doe Defendants. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### A. The Doe Defendants Violated the Computer Fraud and Abuse Act.

The Computer Fraud and Abuse Act prohibits, among other things, "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value." 18 U.S.C. § 1030(a)(4). A "protected computer" includes any computer "used in or affecting interstate or foreign commerce or communication." *Id.* § 1030(e)(2)(B). The statute confers a private right of action on any person who suffers damage or loss by reason of a violation, and expressly authorizes that person to obtain "compensatory damages and injunctive relief or other equitable relief." *Id.* § 1030(g). The Court's authority to enter the preservation relief Bybit seeks here is therefore grounded not only in the common-law claims set forth below, but in the CFAA itself.

Here, the Doe Defendants accessed the workstations of Bybit's authorized wallet signers and Bybit's cold-wallet authorization system through a coordinated intrusion that exploited the wallet-signing process. Xin Decl. ¶¶ 10–17. Specifically, the Doe Defendants first compromised the cloud-hosted infrastructure of Safe{Wallet}, a third-party multisignature interface that Bybit's authorized signers used to approve cold-wallet transactions, and injected malicious code into that interface. When Bybit authorized signers connected to the compromised interface from their workstations to approve a routine transfer, the malicious code caused those signers to unknowingly authorize an unauthorized upgrade of Bybit's cold-wallet smart contract—replacing it with a malicious implementation contract the Doe Defendants had pre-deployed and that contained concealed backdoor functions. Xin Decl. ¶ 14.

23

By means of that unauthorized contract upgrade, the Doe Defendants obtained the ability to issue commands to Bybit's cold-wallet system that Bybit never authorized, and they invoked the concealed backdoor functions to drain the wallet's contents. The Bybit signer's workstations and Bybit's cold-wallet authorization system are each "protected computer[s]" under 18 U.S.C. § 1030(e)(2)(B) because each is used in and affects interstate and international commerce. Xin Decl. ¶ 8. The Doe Defendants then used that unauthorized access "to obtain[] something of value"—the approximately $1.5 billion in Ethereum that remains traceable to the wallets identified in Exhibit A. Under the CFAA, Bybit is entitled to injunctive relief, including the return of the stolen property. *Id.* § 1030(g). Federal courts have recognized that cryptocurrency thefts effected through unauthorized access to wallet infrastructure violate the CFAA and support preliminary injunctive relief. *See, e.g., Legacy Invs.*, No. 3:25-cv-08800 (granting TRO based in part on CFAA violation in $28 million theft of USDC and USDT). More broadly, federal courts have entered both preliminary and permanent injunctive relief under § 1030(g) against foreign state-aligned cyber actors and other CFAA violators. *See WhatsApp Inc. v. NSO Group Techs. Ltd.*, No. 4:19-cv-07123 (N.D. Cal. Oct. 17, 2025) (permanent injunction under § 1030(g) against state-aligned defendant for unauthorized access via Pegasus spyware); *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 781–82 (N.D. Cal. 2017) (recognizing that unauthorized access in violation of the CFAA establishes irreparable harm); *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156–57 (5th Cir. 2006) (confirming that § 1030(g) authorizes injunctive relief). The FBI's contemporaneous public attribution of the conduct to the Lazarus Group further obviates any reasonable doubt about the identity of the wrongdoers or the wrongful character of their access. *See* PSA.

### B. The Doe Defendants Engaged in a Pattern of Racketeering Activity.

The Doe Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. A civil RICO claim requires (1) conduct (2) of

24

an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). "Racketeering activity" includes wire fraud (18 U.S.C. § 1343), money laundering (18 U.S.C. § 1956), and Computer Fraud and Abuse Act violations involving theft of trade secrets or financial information. 18 U.S.C. § 1961(1). Here, the Doe Defendants operated as an enterprise—an associated-in-fact group functioning under the Lazarus Group banner with shared infrastructure, coordinated laundering channels, and unified direction. An association-in-fact enterprise need only possess "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009); *accord Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 100–01 (D.D.C. 2016) (D.C. Circuit three-part test: common purpose, organization, and continuity) (citing *United States v. Richardson*, 167 F.3d 621, 625 (D.C. Cir. 1999)). Federal courts have recognized that transnational cybercrime collectives operating across U.S.-connected infrastructure satisfy that test. *See Google LLC v. Does 1-25 ("Lighthouse Enterprise")*, No. 1:25-cv-09421 (S.D.N.Y. Dec. 1, 2025) (preliminary injunction; global phishing collective alleged as RICO enterprise); *Microsoft Corp. v. Does 4-10 Operating an Azure Abuse Network*, No. 1:24-cv-02323 (E.D. Va. Dec. 19, 2024) (*ex parte* TRO against cybercrime collective alleged as RICO enterprise).

The Doe Defendants engaged in a pattern of racketeering activity that includes not only the February 21, 2025 Bybit theft but also additional documented Lazarus-attributed thefts, including the January 2025 theft from Phemex whose proceeds, forensic analysis confirms, are held in wallets under common control with the Bybit proceeds. They committed predicate acts of wire fraud (transmitting malicious code through interstate and international communications to redirect Bybit's cryptocurrency) and money laundering (transferring the stolen proceeds through mixers, cross-chain bridges, and exchanges to obscure their origin). And the

25

racketeering activity is continuing—it began on February 21, 2025 and continues through the date of this Motion, as the Doe Defendants persist in moving and laundering the stolen funds.

Although the Doe Defendants' operations span multiple jurisdictions, the conduct giving rise to Bybit's RICO claim has a substantial domestic nexus sufficient to establish a domestic injury under *Yegiazaryan v. Smagin*, 599 U.S. 533, 543–45 (2023), and its application in *United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118, 144–46 (D.D.C. 2024). As *Yegiazaryan* held, "[a] plaintiff alleges a domestic injury for purposes of § 1964(c) when the circumstances surrounding the injury indicate it arose in the United States." 599 U.S. at 535. The "context-specific" test looks to "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." *Id.*; *see Hawkins*, 752 F. Supp. 3d at 126 ("[I]n assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury."). Several features of the racketeering activity here ground it in the United States: the malicious code was injected into AWS-hosted developer infrastructure operated from the United States; the stolen funds were laundered through U.S.-dollar-denominated stablecoins issued by U.S.-based custodians and routed through cryptocurrency exchanges with U.S. infrastructure; United States holders of digital assets bore market-wide losses from the disruption to the cryptocurrency market that the theft and ensuing laundering activity caused; and the federal government has both publicly attributed the conduct and imposed sanctions targeting it as a threat to U.S. interests. Under *Yegiazaryan*'s controlling formulation, the "circumstances surrounding the alleged injury" are sufficiently grounded in the United States to establish a domestic injury for purposes of civil RICO. 599 U.S. at 535.

The Lazarus Group enterprise has been documented and corroborated by both the federal government and independent investigators. The FBI's IC3 Public Service Announcement of February 26, 2025 attributed the February 21 attack to the Lazarus Group.

26

The United States Department of the Treasury reinforced that attribution through two separate designations: a November 4, 2025 action identifying fifty-three cryptocurrency addresses associated with DPRK laundering operations and expressly tying those operations to the Bybit theft, and a March 12, 2026 expansion adding six individuals, two entities, and twenty-one additional cryptocurrency addresses. Independent private-sector investigators—including the cybersecurity firms Sygnia and Verichains, each retained to conduct forensic analysis of the attack—separately concluded that the conduct bears the technical hallmarks of Lazarus Group operations. Xin Decl. ¶ 25. In light of the uncontested record, Bybit is likely to succeed on the merits of its RICO claim.

### C. The Doe Defendants Converted Bybit's Property.

Bybit is also likely to succeed in showing the Defendants unlawfully converted its property. Under District of Columbia law, conversion is the "unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." *Papageorge v. Zucker*, 169 A.3d 861, 864 (D.C. 2017); *see Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 339 (D.D.C. 2011) (citing *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956)). Although the personal property at issue in a conversion action is generally tangible (*i.e.*, physical chattels), the doctrine reaches money and intangible property where "the plaintiff has the right to a specific identifiable fund." *Papageorge*, 169 A.3d at 864 (quoting *McNamara v. Picken*, 950 F. Supp. 2d 193, 194 (D.D.C. 2013)). Cryptocurrency satisfies that requirement: each token transferred from Bybit's cold wallet is identifiable on the public blockchain ledger by hash, address, and block confirmation. *See Harmon*, 474 F. Supp. 3d at 81–82 (describing the blockchain as "a public ledger that records every bitcoin transaction" maintained as "a current, immutable history of all transactions ever logged"); *see also Astrove v. Doe*, No. 9:22-cv-80614, slip op. (S.D. Fla. Apr. 20, 2022); *Jacobo*, 2022 WL 2052637, at *3; *Legacy Invs.*, No. 3:25-cv-08800, slip op.

27

Here, there is no doubt that the Doe Defendants are liable for conversion. Bybit owned the cryptocurrency held in its cold wallet on February 21, 2025—property that, although attributable in part to customer balances, was held by Bybit under custodial title and emerged from the attack as Bybit's loss to bear. Xin Decl. ¶ 7. The Doe Defendants exercised dominion over that cryptocurrency without authorization when they redirected it to wallets they controlled, in denial of Bybit's right to the property. Bybit then suffered the immediate loss of approximately $1.5 billion in customer-attributable assets, which Bybit was forced to absorb to keep its customers whole. Xin Decl. ¶ 19. The Doe Defendants' continued possession and active laundering of the stolen property compounds the harm and underscores the wrongful character of the conversion. Bybit is thus entitled to preliminary relief.

### D. The Doe Defendants Have Been Unjustly Enriched at Bybit's Expense.

The Doe Defendants' retention of the stolen funds is the paradigmatic case of unjust enrichment. Under District of Columbia law, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). The doctrine is a creature of equity, and the remedy it authorizes is disgorgement of the wrongfully retained benefit, often through the imposition of a constructive trust over identifiable property—exactly the relief Bybit seeks here. *See Hertz v. Klavan*, 374 A.2d 871, 873 (D.C. 1977) ("A constructive trust is a flexible remedial device used to force restitution in order to prevent unjust enrichment."). Courts in this District have granted preliminary injunctive relief freezing wrongfully retained funds on an unjust-enrichment theory. *See District Title v. Warren*, 181 F. Supp. 3d 16, 32–35 (D.D.C. 2014); *see also JSC Transmashholding v. Miller*, 70 F. Supp. 3d 516, 525–26 (D.D.C. 2014) (retention of funds traceable to embezzlement states an unjust-enrichment claim even absent fault on the part of the recipient); *United States v. All Assets Held at Bank Julius Baer*

28

& *Co.*, 772 F. Supp. 2d 191, 199–200 (D.D.C. 2011) (tying Restatement unjust-enrichment principle to wrongful acquisition). Federal courts have also entered default judgment on unjust-enrichment and constructive-trust theories in analogous cases involving the theft of crypto assets. *See Yogaratnam*, No. 2:24-cv-00393 (default judgment for conversion, unjust enrichment, and constructive trust based on cryptocurrency theft).

Here too, there is no doubt that Bybit is likely to succeed on the merits of its unjust enrichment claim. The Doe Defendants received an enormous benefit at Bybit's expense: approximately $1.5 billion in cryptocurrency that Bybit owned and was forced to replace at its own cost. The Doe Defendants retain a portion of that benefit in the specific wallets identified in Exhibit A. To say that retention is "unjust" would be an understatement. It is the product of one of the largest documented financial crimes in history, carried out by a state-sponsored cyber threat actor whose conduct the United States government has publicly condemned and sanctioned. No colorable argument supports the Doe Defendants' continued retention of the stolen funds.

### E. The Doe Defendants Committed Fraud Against Bybit.

Under District of Columbia law, the "essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977); *accord Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 78 (D.D.C. 2005). The Doe Defendants' conduct here was textbook fraud. They modified Safe{Wallet}'s software so that when Bybit's executives looked at their screens during a routine cold-wallet transfer, the screens displayed a legitimate transfer to a correct destination, while the modified code executed a different transaction redirecting $1.5 billion to wallets the Doe Defendants controlled. Xin Decl. ¶ 14. The deception was deliberate, the false representation was material in the most fundamental sense (it was the predicate for the transfer

29

of $1.5 billion in cryptocurrency), and Bybit's systems and human operators justifiably relied on the falsified signing process. The Doe Defendants knew their representation of legitimate signing authority was false. They engineered the falsification weeks in advance through the supply-chain compromise of Safe{Wallet}'s developer infrastructure; and the resulting transfer of $1.5 billion in cryptocurrency was the direct and intended consequence of the fraud.

### F. The Court Should Impose a Constructive Trust Over the Stolen Cryptocurrency.

Where, as here, the plaintiff has identified specific stolen property in the defendant's hands and asserts an equitable claim to that property, courts have long had authority to preserve the property pending adjudication by recognizing the establishment of a constructive trust. "A constructive trust is a flexible remedial device used to force restitution in order to prevent unjust enrichment." *Hertz*, 374 A.2d at 873. To be sure, not every Doe Defendant participated directly in the theft, but that does not undermine Bybit's entitlement to relief. The constructive-trust remedy follows the property, not just the original wrongdoer: once the trust attaches, the equitable interest reaches the property "in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000). The Doe Defendants identified in Exhibit A—whether they participated in the February 21 attack itself or received traceable proceeds downstream—are not bona fide purchasers, and equity treats each as a constructive trustee for Bybit's benefit. *See Hertz*, 374 A.2d at 873. The effect of that equitable conversion is dispositive: a constructive trustee holds the property *for* the rightful owner, with no legitimate possessory interest of his own, and must return it. *See Bolle v. Hume*, 619 A.2d 1192, 1196 (D.C. 1993).

Federal courts have imposed constructive trusts over cryptocurrency proceeds traceable to theft. *See Jacobo*, 2022 WL 2052637, at *3; *Astrove*, No. 9:22-cv-80614, slip op.; *Legacy*

30

*Invs.*, No. 3:25-cv-08800, slip op. As explained above, cryptocurrency is individually traceable on the public blockchain ledger. While the Doe Defendants' efforts to launder the proceeds make that task more difficult, Bybit has been able to follow the specific Ethereum redirected from its cold wallet on February 21, 2025 to the destination addresses identified in Exhibit A, regardless of the laundering hops in between. Absent relief, the Doe Defendants will no doubt take additional steps to dissipate the assets. On these facts, the court should impose a constructive trust and temporarily enjoin further transfer of the assets.

### G. Bybit Is Entitled to Replevin of the Specific Stolen Cryptocurrency.

Under District of Columbia law, replevin is "an action 'brought to recover personal property to which the plaintiff is entitled, that is alleged to have been wrongfully taken or to be in the possession of and wrongfully detained by the defendant.'" *Hunt v. DePuy Orthopaedics, Inc.*, 729 F. Supp. 2d 231, 232 (D.D.C. 2010) (quoting D.C. Code § 16-3701). "The 'essence' of both a replevin action and a conversion action is the 'wrongful withholding of the property in question.'" *Id.* (quoting *Mac'Avoy v. Smithsonian Inst.*, 757 F. Supp. 60, 67 (D.D.C. 1991)). To proceed, a plaintiff must show (1) a superior possessory right to the specific personal property, (2) identifiable property capable of delivery, and (3) wrongful taking or detention by the defendant. *See Deegan v. Strategic Azimuth LLC*, 768 F. Supp. 2d 107, 116 (D.D.C. 2011) (applying D.C. Code §§ 16-3702, 16-3703). Replevin gives the plaintiff the property itself, not damages measured by its value—exactly the relief Bybit seeks here.

Cryptocurrency satisfies replevin's identifiability and capacity-to-be-delivered elements for the reasons set forth in Section I.C *supra. See also Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) (conversion of intangible property). Federal courts applying analogous doctrines have recognized claims for the return of traceable stolen cryptocurrency. *See Legacy Invs.*, No. 3:25-cv-08800; *Jacobo*, 2022 WL 2052637; *Astrove*, No. 9:22-cv-80614.

31

Bybit is entitled to replevin of the specific stolen cryptocurrency. Bybit's possessory right is superior to the Doe Defendants': Bybit owned the cryptocurrency in its cold wallet on February 21, 2025, and the theft did not transfer ownership because it was wrongful. Xin Decl. ¶ 7. The property is identifiable and capable of delivery: each unit of stolen Ethereum can be followed transaction by transaction across the public blockchain ledger to the destination addresses identified in Exhibit A. And the Doe Defendants' detention of that property is wrongful at every link in the chain—beginning with the unauthorized intrusion on February 21, 2025 and continuing through every laundering hop to the present.

## H. The Doe Defendants Tortiously Interfered With Bybit's Customer Relationships.

The Doe Defendants' conduct also gives rise to a claim for tortious interference with Bybit's contractual relationships with its customers. Under District of Columbia law, tortious interference with contract requires (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) intentional procurement of its breach, and (4) damages. *See Casco Marina Dev., L.L.C. v. D.C. Redev. Land Agency*, 834 A.2d 77, 83 (D.C. 2003). Bybit's terms of service create custodial obligations to safeguard each customer's digital assets, including the Ethereum that was redirected from Bybit's cold wallet on February 21, 2025. Xin Decl. ¶ 5. The Doe Defendants knew that Bybit was a cryptocurrency exchange maintaining custodial obligations to its customers, and their unauthorized intrusion and conversion of those assets directly interfered with Bybit's performance of those custodial obligations. Bybit suffered damages in the form of the approximately $1.5 billion in cryptocurrency Bybit was forced to replace at its own expense to keep its customers whole. Xin Decl. ¶ 19.

\*\*\*

Even at this stage, the evidence in support of Bybit's claims is overwhelming. The federal government has publicly attributed the underlying conduct to the wrongdoers. The

32

blockchain forensic record traces the stolen funds to identifiable wallets the Doe Defendants control. And the conduct violates eight independent federal and common-law prohibitions—the Computer Fraud and Abuse Act, common-law conversion, unjust enrichment, common-law fraud, the constructive-trust doctrine, RICO, the common-law action for replevin, and tortious interference with contract—each of which independently warrants the requested preservation relief.

## II. BYBIT WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE RELIEF.

Without immediate relief, Bybit's ability to recover the stolen cryptocurrency will undoubtedly erode by the day. To establish irreparable harm, the movant must show that the threatened injury is "certain and great," is "actual and not theoretical," and is "of such imminence that there is a clear and present need for equitable relief." *Chaplaincy*, 454 F.3d at 297 (citation modified). The injury also must be one that cannot adequately be remedied through monetary damages alone. *Id.* at 297–98. These requirements are satisfied here.

### A. The Doe Defendants Are Actively Dissipating the Specific Assets That Were Stolen in the Theft.

Immediate relief is necessary to stop the ongoing dissipation of the specific stolen assets identified in Exhibit A. The forensic record establishes that the Doe Defendants have been moving and laundering the stolen funds continuously since February 21, 2025, and continue to do so as of the date of this Motion. Xin Decl. ¶ 41. This is not a case in which the movant fears that the defendant *might* dissipate assets. The dissipation is documented, ongoing, and will most certainly increase when the Doe Defendants receive notice or otherwise learn of this litigation.

Each laundering transaction increases the cost and difficulty of recovery, and at the margin pushes traceable property toward effectively unrecoverable form. When stolen

33

cryptocurrency passes through a mixer, the blockchain trail that would otherwise support straightforward recovery is obscured; tracing may remain technically possible, but only through substantially greater forensic effort and at substantially greater cost to Bybit. Xin Decl. ¶ 42. A cryptocurrency mixer operates by "disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions," a process that "makes it next to impossible to determine the origin of the bitcoin deposited in that separate account." *United States v. Sterlingov*, No. 21-cr-399 (D.D.C. Mar. 6, 2023); *see also Van Loon v. Dep't of the Treasury*, 122 F.4th 549 (5th Cir. 2024) (describing the Tornado Cash mixer protocol). When stolen cryptocurrency moves through a cross-chain bridge from Ethereum to Tron or Bitcoin or another protocol, additional tracing complexity is introduced, and each transit risks the funds passing into venues where neither U.S. courts nor cooperative foreign authorities have practical reach. Xin Decl. ¶ 42. And when stolen cryptocurrency is exchanged for so-called privacy coins—digital assets engineered to obscure transactional history—the funds may pass beyond the practical reach of any tracing methodology.

The risk of accelerated dissipation is now especially acute. The filing of this action puts the Doe Defendants and their downstream co-conspirators on notice that Bybit is pursuing court-ordered recovery of the specific stolen assets—a notice that will create a strong incentive for the Doe Defendants to accelerate laundering activity before any restraint takes effect. Filing this action is the functional equivalent of law enforcement action, and examples of platform shutdowns like eXch show exactly how quickly cryptocurrency launderers will react once on notice of governmental involvement.[8] This risk is real and precisely why the requested *ex parte* relief is warranted.

---

[8] TRM Labs, *eXch Remains Active Despite Shutdown: How the Bybit Hack-Linked Exchange Continues to Enable Laundering*, (May 2, 2025), supra note 7.

34

## B. Restraining the Assets Is the Only Mechanism That Will Allow Recovery of the Stolen Property.

The dissipation of specific, identifiable property in which the plaintiff asserts an equitable interest is the paradigmatic irreparable harm. The blockchain ledger makes the property nexus concrete in a way that traditional fungible-property cases never could: the specific Ethereum redirected from Bybit's cold wallet on February 21, 2025 is identifiable at every successor wallet, and the present location of the traceable proceeds is identifiable at the wallets listed in Exhibit A. Courts have recognized that the dissipation of traceable cryptocurrency causes irreparable harm warranting preliminary injunctive relief. "Because it would be a simple matter for [defendant] to transfer . . . cryptocurrency to unidentified recipients outside the traditional banking system and effectively place the assets at issue in this matter beyond the reach of the court, the court finds that plaintiff is likely to suffer immediate and irreparable harm in the absence of injunctive relief." *Jacobo*, 2022 WL 2052637, at *5. A plaintiff's "potential recovery of assets" will thus "disappear if Defendants transfer the allegedly stolen assets into inaccessible digital wallets, which could occur at any moment." *Yogaratnam*, No. 2:24-cv-00393, slip op. at *3; *accord Legacy Invs.*, No. 3:25-cv-08800; *Astrove v. Doe*, No. 9:22-cv-80614. Bybit will therefore face irreparable harm if the cryptocurrency is not restrained pending resolution of this action.[9]

---

[9] Bybit acknowledges that a subset of the wallets identified in Exhibit A holds assets that the United States Department of the Treasury's Office of Foreign Assets Control has separately designated and blocked under the International Emergency Economic Powers Act and related sanctions authorities. The requested Order is not designed to displace or duplicate that sanctions-based blocking, and Bybit will, if and when a default judgment issues, seek any specific license required under 31 C.F.R. Part 501 to enforce the judgment against blocked property.

## C. Monetary Damages Are an Inadequate Remedy.

Although Bybit's claims involve stolen financial assets, the availability of monetary damages is not sufficient to guarantee relief. The Doe Defendants are anonymous. They operate exclusively through pseudonymous wallets. Their identities cannot be ascertained through ordinary process. A money judgment against the Doe Defendants is currently and may well remain practically unenforceable. There is no person against whom to collect, no asset to attach, no entity to garnish. "[G]iven the speed with which cryptocurrency transactions are made, the fact that transactions on the ... blockchain are irreversible, and the pseudonymous nature of those transactions, remedies at law are plainly inadequate to redress the harm to the Movant[]." *Liu v. Project Invs., Inc.*, No. 9:16-cv-80060 (S.D. Fla. June 4, 2021); *see id.* ("[M]onetary damages and/or other remedies available at law are inadequate to compensate for this injury [because the] Defendant . . . has not appeared in this matter, is in sole possession of the private keys to the Stolen Bitcoin . . . [and] appears to be actively laundering the Stolen Bitcoin to deprive [plaintiffs] of the assets rightfully belonging to them.").

But the inadequacy of a monetary remedy is not a function merely of the Doe Defendants' anonymity. They are operating in coordination with an actor that has deliberately situated itself outside the international financial system. The Democratic People's Republic of Korea does not maintain assets in conventional banking channels reachable through ordinary collection process. The regime generates revenue principally through sanctions evasion and cryptocurrency-laundering operations, including the conduct at issue here. The specific traceable cryptocurrency identified in Exhibit A is, accordingly, the only realistic source of recovery for the specific stolen property. If those assets dissipate, the only avenue for return of the stolen property itself disappears.

For these reasons, monetary damages are not an adequate substitute for the preservation relief Bybit requests. The relief Bybit seeks is the preservation of specific identifiable property

36

in which Bybit holds an equitable interest—relief for which Bybit has no available remedy at law.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR EMERGENCY RELIEF.

The balance of equities and the public interest both weigh strongly in favor of the requested relief. *See Winter*, 555 U.S. at 20. The Doe Defendants have no legitimate interest in retaining cryptocurrency they stole, and the public interest in restraining the dissipation of state-sponsored cybercrime proceeds is among the strongest the federal courts have ever been asked to vindicate.

### A. The Balance of Equities Tips Sharply Toward Bybit.

The balance-of-equities inquiry asks the Court to weigh the harm Bybit would suffer absent relief against the harm the requested order would impose on the Doe Defendants. The asymmetry here is stark. On Bybit's side: continued, irreversible dissipation of the only assets that can support recovery. On the Doe Defendants' side: a temporary order preventing them from transferring property they obtained through theft and have no lawful right to possess. The Doe Defendants cannot claim legally cognizable harm from being restrained from disposing of stolen property. *See, e.g., Jacobo*, 2022 WL 2052637, at *3 (entering TRO without bond where defendants held stolen cryptocurrency and could not, as a matter of law, suffer cognizable damages from a wrongful-restraint claim). That conclusion follows from elementary principles of equity. A defendant has no legitimate property interest in the proceeds of theft. *Cf.* Restatement (Third) of Restitution and Unjust Enrichment § 55 (Am. Law Inst. 2011) (recognizing constructive-trust remedy over wrongfully acquired property). The Doe Defendants accordingly cannot complain that their ability to launder, convert, or further

37

disperse the stolen cryptocurrency is being temporarily impaired by court order. The harm the proposed order imposes on them is, properly understood, no harm at all. *See id.*

The requested order is also narrowly tailored to minimize any conceivable burden on third parties. By its terms, the Order binds only "the parties" and "other persons who are in active concert or participation with" them. Fed. R. Civ. P. 65(d)(2). For any nonparty who receives notice of the Order and believes its application to particular funds is doubtful or mistaken, the Federal Rules and longstanding Supreme Court doctrine provide a clear procedural mechanism: the nonparty may petition this Court for clarification or modification. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) ("If [parties] enter upon transactions which raise doubts as to the applicability of the injunction, they may petition the court granting it for a modification or construction of the order. ... courts would not be apt to withhold a clarification in the light of a concrete situation."); *see also Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 130 (2d Cir. 2014) ("Nonparties, of course, may seek clarification from district courts when questions arise as to who is bound by an injunction through operation of Rule 65." (citation modified)). The result is a temporary measure, not a permanent deprivation, that preserves the identifiable stolen property pending adjudication while leaving legitimate wallet holders a path to seek relief.

### B. The Public Interest Decisively Favors Relief.

Finally, the public interests in favor of granting the Order are strong, and they pull in a single direction. *See Winter*, 555 U.S. at 20.

*First*, the funds at issue are the proceeds of a state-sponsored theft carried out by the Lazarus Group, a threat actor whose conduct the United States government has publicly and repeatedly condemned. The FBI has attributed the attack to DPRK-directed actors and urged the private sector, including "RPC node operators, exchanges, bridges, blockchain analytics

38

firms, DeFi services, and other virtual asset service providers" to block transactions derived from the laundering addresses. *See* IC3 Public Service Announcement (Feb. 26, 2025). The United States Department of the Treasury has likewise identified specific cryptocurrency addresses associated with the broader DPRK laundering apparatus. The Treasury Department has been explicit about the purpose of those operations: "North Korean state-sponsored hackers steal and launder money to fund the regime's nuclear weapons program." Press Release, U.S. Dep't of the Treasury, Treasury Sanctions DPRK Bankers and Institutions Involved in Laundering Cybercrime Proceeds and IT Worker Funds (Nov. 4, 2025) (statement of Under Secretary for Terrorism and Financial Intelligence John K. Hurley). The public's interest in the effective enforcement of those designations—and in the underlying sanctions regime that supports the United States' nonproliferation policy—is substantial. The public interest is heightened further by forensic tracing evidence that a portion of the laundered proceeds was transferred via United States-dollar stablecoins to wallets associated with Iranian sanctioned actors, meaning the proceeds of a single theft can fund the weapons and terror programs of two sanctioned regimes. Xin Decl. ¶ 40. *See* 50 U.S.C. § 1701 *et seq.* (International Emergency Economic Powers Act); Imposing Additional Sanctions With Respect to North Korea, 80 Fed. Reg. 819 (Jan. 2, 2015) (Exec. Order No. 13687) (blocking property of designated DPRK persons).[10]

*Second*, allowing the Doe Defendants to continue laundering the stolen funds would directly frustrate the federal government's and the international community's policy of

---

[10] In addition, the United States has taken recent steps to elevate cryptocurrency to a strategic asset class. *See* Exec. Order No. 14233, 90 Fed. Reg. 11,789 (Mar. 6, 2025) (establishing Strategic Bitcoin Reserve and United States Digital Asset Stockpile). The Order designates Bitcoin and other digital assets as instruments of national economic policy, reinforcing the public interest in the United States courts' effective protection of stolen digital assets traceable to specific holders.

restricting DPRK's access to international financial channels to fund its weapons of mass destruction and ballistic missile programs. United Nations Security Council Resolutions 1718 (2006), 2270 (2016), 2321 (2016), and 2371 (2017) prohibit the transfer of financial assets to the DPRK in support of those programs. The scale of DPRK cyber-theft as a sanctions-evasion mechanism is not contested. The Multilateral Sanctions Monitoring Team, the eleven-nation successor to the UN Panel of Experts, found that DPRK cyber actors stole at least $2.8 billion from January 2024 through September 2025 across more than forty cryptocurrency heists—proceeds that, in the MSMT's words, generate "revenue for the DPRK's unlawful weapons of mass destruction (WMD) and ballistic missile programs" and "routinely violat[e] UN Security Council resolutions." The requested order, in restraining further movement of the stolen funds, supports rather than undermines that public policy.

*Third*, the requested relief vindicates the broader public interest in the integrity of cryptocurrency markets and the protection of victims of cybercrime. Within hours of the February 21, 2025 attack, Bybit publicly confirmed that customer assets were "1 to 1 backed" and that the loss would be absorbed by the exchange. Bybit honored that commitment in real time: it processed over 350,000 withdrawal requests in the first ten hours following the theft, completing 99.994% of them, and obtained emergency funding of approximately 447,000 ETH from Galaxy Digital, FalconX, and Wintermute to replenish reserves. An independent proof-of-reserves audit conducted by the cybersecurity firm Hacken confirmed that Bybit's assets exceeded 100% collateralization within a day after the attack. Bybit then launched the LazarusBounty program—an "industry-first bounty platform" offering a recovery pool equal to 10% of recovered funds—to coordinate the public-private effort to recover the stolen cryptocurrency. By absorbing the full $1.5 billion loss to keep every customer whole, Bybit set the industry standard for how a regulated cryptocurrency exchange responds to a catastrophic theft—a standard that depends, in turn, on the availability of meaningful judicial remedies to

recover the stolen property. The cryptocurrency sector as a whole has an interest in deterring future state-sponsored thefts, in confirming that the federal courts will not treat cryptocurrency as a lawless space, and in supporting the development of doctrinal frameworks that permit the recovery of stolen digital assets. *See Legacy Invs.*, No. 3:25-cv-08800 (recognizing public interest in protecting cryptocurrency markets and deterring digital-asset theft).

The relief requested in this Motion thus vindicates a rare convergence of public and private interests: Bybit's interest in the return of its stolen property; the federal government's interest in counterproliferation and sanctions enforcement; the international community's interest in a rule-of-law response to state-sponsored cybercrime; and the cryptocurrency industry's interest in deterring future attacks of this kind. No public-interest consideration cuts the other way.

The balance of equities and the public interest both support the requested relief.

## IV. THE COURT SHOULD ENTER RELIEF WITHOUT NOTICE.

Federal Rule of Civil Procedure 65(b)(1) authorizes the Court to issue a temporary restraining order without notice to the adverse party where (1) "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (2) the movant's attorney "certifies in writing any efforts made to give notice and the reasons why it should not be required." Both requirements are satisfied here.

### A. Notice Cannot Be Given to Anonymous Defendants Who Operate Through Pseudonymous Wallets.

The Doe Defendants are, by definition, unknown. Their identities are concealed behind pseudonymous blockchain addresses, and—the federal government's attribution of their conduct to the Lazarus Group notwithstanding—the specific natural persons operating each

41

wallet identified in Exhibit A cannot be identified through ordinary process. They maintain no service addresses, no registered agents, and no identifiable physical presence. The accompanying Certification of Counsel under D.D.C. Local Civil Rule 65.1, filed concurrently with this Motion, sets forth in detail the efforts Bybit has undertaken to identify the Doe Defendants and the reasons those efforts cannot, on the timeline this dissipation imposes, succeed before the requested relief becomes ineffective.

Courts have repeatedly held that the anonymity of cryptocurrency-theft defendants—coupled with the active dissipation of traceable assets—satisfies Rule 65(b)(1)'s no-notice predicate. In *Jacobo,* the court recognized that "it would be a simple matter for [defendant] to transfer . . . cryptocurrency to unidentified recipients outside the traditional banking system" and to "effectively place the assets at issue in this matter beyond the reach of the court," and accordingly entered *ex parte* relief. *Jacobo,* 2022 WL 2052637, at *5. The court in *Yogaratnam* applied the same reasoning, holding that "[p]laintiff's potential recovery of assets will disappear if Defendants transfer the allegedly stolen assets into inaccessible digital wallets, which could occur at any moment." *Yogaratnam,* No. 2:24-cv-00393, slip op. at *3. *Accord Legacy Invs.,* No. 3:25-cv-08800; *Astrove,* No. 9:22-cv-80614. The reasoning is straightforward: where defendants cannot be identified, and where any delay associated with attempting to provide notice would itself cause the irreparable harm that the order is designed to prevent, Rule 65(b)(1)'s requirements are met.

## B. Providing Notice Would Itself Trigger the Dissipation the Order Is Designed to Prevent.

Even if the Doe Defendants could somehow be reached with advance notice, providing such notice would be self-defeating. The Doe Defendants are professional cryptocurrency-laundering operators acting under the direction of a state-sponsored cyber threat actor that has demonstrated, repeatedly and at scale, both the willingness and the operational capability to

42

move cryptocurrency rapidly through laundering channels. Any notice to the Doe Defendants—or to the broader Lazarus Group laundering apparatus—that this Motion was being filed would trigger an immediate effort to move the traceable funds beyond the reach of the order before it could issue.

Rule 65(b)(1) was designed precisely for circumstances of this kind. The Ninth Circuit has recognized that *ex parte* relief is appropriate where the moving party "shows that notice itself would render fruitless the further prosecution of the action." *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). The Second Circuit has similarly held that *ex parte* TROs are warranted where "notice to the defendant would render fruitless the further prosecution of the action." *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4–5 (2d Cir. 1979). The principle reflects the practical reality that "an applicant must do more than assert that the adverse party would dispose of evidence if given notice"; the applicant must show that the very act of giving notice would defeat the order. *Reno Air Racing*, 452 F.3d at 1131; *see also* 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2952 (3d ed. 2012) (collecting cases recognizing that *ex parte* relief is appropriate where notice would frustrate the order's purpose). Here, the operational sophistication of the Lazarus Group laundering apparatus and the speed at which cryptocurrency can be moved across protocols make this case the paradigm to which *Reno Air Racing* and *In re Vuitton* speak.

### C. Bybit Will Effectuate Service of the Order Promptly After Entry.

Although notice cannot precede entry of the order, Bybit will undertake immediate service of the Order on the Doe Defendants and on all relevant third-party cryptocurrency exchanges and service providers identified in Exhibit A to the Motion. As set forth in the prayer for relief below, Bybit requests leave to serve the Doe Defendants by delivery of a non-fungible token to the wallet addresses identified in Exhibit A—a service mechanism that other federal courts have approved in similar cases involving stolen cryptocurrency held by anonymous

43

wallet operators. *See Legacy Invs.*, No. 3:25-cv-08800; *LCX AG v. John Does Nos. 1-25*, No. 154644/2022 (N.Y. Sup. Ct. June 2, 2022). Service on the third-party exchanges and service providers identified in Exhibit A will occur via the conventional means each entity has designated for legal process.

Under Federal Rule of Civil Procedure 65(d)(2)(C), the requested Order will bind not only the Doe Defendants but also "other persons who are in active concert or participation" with them upon receipt of actual notice. The third-party cryptocurrency exchanges and service providers identified in Exhibit A fall squarely within that provision: each holds traceable proceeds of the February 21, 2025 theft for the benefit of the Doe Defendants, and once served with the Order, each will be on actual notice of both the existence of the Order and the traceable status of the deposits in its custody. Federal courts have applied Rule 65(d)(2)(C) in materially identical cryptocurrency-theft cases to bind third-party exchanges holding traceable stolen proceeds. *See Legacy Invs.*, No. 3:25-cv-08800; *LCX AG*, No. 154644/2022. Each exchange identified in Exhibit A will therefore be bound by the Order from the moment of service.

The Doe Defendants are anonymous, professionally sophisticated cryptocurrency-laundering operators who have demonstrated both the willingness and the capability to move stolen funds across protocols at a moment's notice. Notice would either be impossible (because the Doe Defendants cannot be reached through ordinary process) or self-defeating (because any notice would trigger immediate dissipation of the funds the Order is designed to preserve). Bybit accordingly requests that the Court consider this Motion and enter the requested Order on an *ex parte* basis pursuant to Rule 65(b)(1).

44

## V. THE COURT SHOULD WAIVE THE BOND REQUIREMENT OR SET A NOMINAL BOND.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Rule's text and longstanding application leave the amount of security to the court's discretion, and federal courts in this District and elsewhere have exercised that discretion to waive the security requirement entirely or to set only a nominal bond where the enjoined party has no legitimate property interest that could be harmed by the restraint. *See, e.g., Jacobo,* 2022 WL 2052637, at *3 (TRO entered without bond against Doe defendants holding stolen cryptocurrency); *Yogaratnam,* No. 2:24-cv-00393, slip op. (same); *Astrove,* No. 9:22-cv-80614 (nominal bond); *Legacy Invs.,* No. 3:25-cv-08800 (nominal bond).

The reasons for waiver or nominal security are particularly compelling here. The Doe Defendants are anonymous wrongdoers who have no legitimate possessory interest in the cryptocurrency identified in Exhibit A; as a matter of law, they cannot suffer cognizable damages from being restrained from disposing of stolen property. Requiring a substantial bond would impose costs on Bybit without serving any protective purpose the Rule contemplates. Bybit therefore respectfully requests that the Court waive the security requirement of Rule 65(c) or, in the alternative, set only a nominal bond.

## VI. THE COURT SHOULD ORDER EXPEDITED DISCOVERY TO IDENTIFY THE DOE DEFENDANTS AND TRACE ADDITIONAL STOLEN ASSETS.

In addition to the preservation relief sought by this Motion, Bybit respectfully requests that the Court authorize limited expedited discovery, targeted at the cryptocurrency exchanges identified in Exhibit A and any other third-party custodians holding assets traceable to the

February 21, 2025 theft. Federal Rule of Civil Procedure 26(d)(1) permits a party to seek discovery before the parties have conferred under Rule 26(f) when authorized by court order. This Court has authority to grant such an expedited discovery request upon a showing of good cause. *See In re Fannie Mae Derivative Litig.*, 227 F.R.D. 142, 142–43 (D.D.C. 2005). Good cause exists here for two independent reasons: *first*, expedited discovery is necessary to identify the natural persons who operate the pseudonymous wallet addresses listed in Exhibit A, so that Bybit can amend its Complaint to name them and effectuate formal service of process; and *second*, expedited discovery is necessary to support the preservation relief this Motion seeks, by identifying the current location of traceable stolen assets before those assets are laundered beyond reach.

### A. Good Cause Supports Expedited Discovery to Identify the Doe Defendants.

Federal courts have long recognized that a plaintiff proceeding against anonymous wrongdoers may obtain early discovery to learn their identities. A plaintiff is entitled to such discovery where the defendants cannot otherwise be named and served and the litigation therefore cannot proceed against them without it. *See Arista Records LLC v. Does 1-19*, 551 F. Supp. 2d 1, 6 (D.D.C. 2008) (finding good cause for expedited discovery because "Defendants must be identified before this suit can progress further"). Courts in this District routinely apply that standard to authorize identity-disclosure subpoenas. *See, e.g., Strike 3 Holdings, LLC v. Doe*, No. 18-806, 2018 WL 3344631 (D.D.C. July 9, 2018) (the court "shall be unable to administer any further proceedings in this case absent identification of Doe Defendant").

The Doe Defendants are anonymous. Their identities are concealed behind pseudonymous blockchain addresses. The Complaint names them as John Does not as a placeholder of convenience but as a practical necessity: their true names and capacities cannot be determined through publicly available blockchain data alone. The cryptocurrency exchanges identified in Exhibit A, however, are the entities through which the Doe Defendants moved the

stolen assets, and they collect and maintain customer-identifying information in the ordinary course of their anti-money-laundering compliance. The exchanges are subject to Anti-Money Laundering and Know Your Customer requirements under the Bank Secrecy Act and FinCEN regulations that obligate them to collect and maintain identifying information about their account holders. *See* 31 C.F.R. § 1010.100(ff)(5); FinCEN, Guidance FIN-2019-G001: Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currency (May 9, 2019) (applying the money-transmitter definition to exchangers of convertible virtual currency). As such, they are required to maintain anti-money-laundering programs and to register with FinCEN. *See* 31 C.F.R. §§ 1022.210, 1022.380. The burden of a targeted records search tied to identified wallet addresses is therefore modest, particularly weighed against the interests at stake. *See Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002) (good cause where the need for discovery, in the interest of justice, outweighs the prejudice to the responding party, particularly where requests are "narrowly tailored"). Targeted subpoenas to those exchanges represent the most direct and reliable path to identifying the specific persons who control the wallet addresses in Exhibit A. There is no substitute mechanism available to Bybit. Without the identities of the Doe Defendants, Bybit cannot amend its Complaint to name them, cannot effectuate formal service of process, and cannot convert the default posture of this case into a fully litigated judgment— each of which is a prerequisite to any ultimate recovery of the stolen property.

### B. Good Cause Independently Exists to Support the Requested Preliminary Relief.

Independent of identification, expedited discovery is warranted because it supports the preservation relief this Motion seeks. A party seeking discovery before the Rule 26(f) conference must show good cause. To determine whether good cause exists, courts in this District apply a reasonableness test, assessing the request "in light of the entire record to date

47

and all of the surrounding circumstances." *Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006); *see In re Fannie Mae Derivative Litig.*, 227 F.R.D. at 142–43. The factors that guide that inquiry include whether injunctive relief is pending, the breadth of the requests, their purpose, the burden on the responding party, and how far in advance of the ordinary discovery schedule the request is made. *See Guttenberg v. Emery*, 26 F. Supp. 3d 88, 98 (D.D.C. 2014).

The first of those factors weighs decisively in Bybit's favor. Bybit seeks emergency injunctive relief and has made the showing of likelihood of success and irreparable harm that such relief requires. The standard governing that relief is the same whether styled as a TRO or a preliminary injunction. *See Shelley*, 775 F. Supp. 2d at 202. Courts in this District have readily found good cause for expedited discovery during the pendency of a request for interim relief. *See Disability Rts. Council*, 234 F.R.D. at 6 (noting that courts have favored the reasonableness approach "particularly in cases w[h]ere the expedited discovery is related to a motion for a preliminary injunction").

### C. The Stolen Asset Base Is Dynamic and Continues to Move.

The forensic record confirms that the Doe Defendants have been continuously moving and laundering the stolen funds since February 21, 2025, and continue to do so as of the date of this Motion. The Exhibit A asset map reflects the current state of forensic tracing knowledge; it does not, and cannot, capture assets that have been moved or further obscured since the tracing data was last updated. Targeted discovery directed at cryptocurrency exchanges— particularly the exchanges most recently associated with laundering activity—will allow Bybit to update the asset map and seek an extension of the Court's preservation order to cover newly identified wallet addresses before those assets pass through additional laundering hops and become unrecoverable. Each day without expedited discovery is a day the Doe Defendants

have to move assets from identified wallets into new addresses that are not yet subject to the Court's order.

### D. The Requested Discovery Is Narrowly Tailored and Will Not Impose Undue Burden.

The discovery Bybit seeks is narrow by design. The wallet addresses in Exhibit A are the precise, unique identifiers that anchor the discovery. *See Attkisson v. Holder*, 113 F. Supp. 3d 156, 162 (D.D.C. 2015) (authorizing limited identity-related discovery where the plaintiff already possessed "certain unique characteristics of the alleged tortfeasor (e.g., their IP address)"). Bybit does not seek broad pre-trial discovery into every aspect of the Doe Defendants' operations. It seeks targeted subpoenas for two categories of records from a defined list of third-party exchanges: (i) account-opening documentation, KYC/AML records, and identity-verification materials associated with the specific wallet addresses listed in Exhibit A; and (ii) transaction records for those accounts from February 21, 2025 through the date of production, including all inbound and outbound transfers. That is precisely the type of narrowly circumscribed, urgently necessary discovery that courts in cryptocurrency-theft cases have routinely approved. *See Legacy Invs.*, No. 3:25-cv-08800, slip op.; *Jacobo*, 2022 WL 2052637, at *3; *Yogaratnam*, No. 2:24-cv-00393, slip op. The target exchanges are already obligated by law to maintain the requested records and to produce them in response to lawful legal process. The burden on any individual exchange is therefore limited to the cost of a targeted records search—a burden that is outweighed many times over by the compelling interests at stake in this litigation.

### E. Proposed Scope of Expedited Discovery.

Bybit respectfully requests that the Court authorize it to serve subpoenas under Federal Rule of Civil Procedure 45 on the cryptocurrency exchanges and third-party custodians

identified in Exhibit A, requiring those entities to produce within fourteen (14) days of service: (i) all account-opening documentation, KYC/AML records, and identity-verification materials associated with the wallet addresses identified in Exhibit A; and (ii) complete transaction records for those wallet addresses from February 21, 2025 through the date of production, including all inbound and outbound transactions and any associated counterparty address information; and (iii) the current balance and any open positions, as of the date of production, in all accounts associated with the wallet addresses identified in Exhibit A. This information shall be used exclusively for the purpose of (a) identifying the Doe Defendants by their true names and capacities so that Bybit may amend its Complaint and effectuate formal service of process, and (b) tracing the current location of additional stolen assets so that Bybit may seek an extension of the Court's preservation order to any additional wallets identified through such tracing. Bybit shall maintain all information produced in response to such subpoenas as confidential, shall disclose it only to the extent necessary to advance this litigation, and shall promptly notify the Court if the produced information identifies wallet addresses not yet listed in Exhibit A that Bybit believes should be added to the Court's preservation order.

## CONCLUSION

The theft at issue is not simply a private wrong. It is the most consequential single act of state-sponsored financial crime in the history of cryptocurrency. It was executed to fund a nuclear-armed regime's weapons program in defiance of United States law and United Nations resolutions. The assets identified in Exhibit A are the traceable residue of that crime, and they are moving. This Court has the authority to stop them. For the foregoing reasons, Bybit respectfully requests that the Court:

(1) Issue the proposed Temporary Restraining Order restraining the John Doe Defendants—and all persons acting in active concert or participation with them—from

50

transferring, dissipating, concealing, converting, or otherwise disposing of the cryptocurrency identified in Exhibit A, and any assets directly or indirectly derived from, traceable to, or exchanged for that cryptocurrency, including any converted, substituted, or commingled proceeds thereof, to the extent traceable to the cryptocurrency identified in Exhibit A;

(2) Waive the security requirement of Federal Rule of Civil Procedure 65(c), or in the alternative set a nominal bond, given that the Doe Defendants have no legitimate possessory interest in the stolen property and cannot suffer cognizable harm from the restraint of assets they obtained through theft;

(3) Authorize Bybit to serve expedited subpoenas under Federal Rule of Civil Procedure 45 on the cryptocurrency exchanges and other third-party custodians identified in Exhibit A, requiring those entities to produce within fourteen (14) days of service (i) all account-opening documentation, KYC/AML records, and identity-verification materials; (ii) complete transaction records associated with the wallet addresses identified in Exhibit A from February 21, 2025 through the date of production, including all inbound and outbound transactions and any associated counterparty address information; and (iii) the current balance and any open positions, as of the date of production, in all accounts associated with the wallet addresses identified in Exhibit A; in each case for the purpose of (a) identifying the natural persons who control those wallet addresses and (b) tracing additional stolen assets not yet reflected in Exhibit A;

(4) Upon Bybit's identification through such discovery of additional wallet addresses holding stolen assets that are traceable to the February 21, 2025 theft not presently listed in Exhibit A, authorize Bybit to supplement Exhibit A and extend the preservation Order to cover those additional addresses on an expedited basis, without further noticed motion; and

(5) Grant such other and further relief as the Court deems just and proper.

51

Dated: June 18, 2026

COOLEY LLP

By: */s/ Travis LeBlanc*

    Travis LeBlanc
    tleblanc@cooley.com

    1299 Pennsylvania Avenue, NW
    Suite 700
    Washington, District of Columbia 20004
    Telephone: +1 202 728 7018
    Facsimile:  +1 202 842 7899

    *Attorney for Plaintiff Bybit Technology*
    *Limited*