**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

BYBIT TECHNOLOGY LIMITED,

              Plaintiff,

    v.

DEMOCRATIC PEOPLE'S REPUBLIC OF
KOREA; DPRK RECONNAISSANCE
GENERAL BUREAU; LAZARUS GROUP;
and JOHN DOES 1-20,

              Defendants.

Case No.

**DECLARATION OF ALAN XIN IN SUPPORT OF PLAINTIFF'S
MOTION FOR A TEMPORARY RESTRAINING ORDER**

I, Alan Xin, hereby declare as follows:

1. I am over the age of eighteen and fully competent to make this declaration. I am Head of Blockchain Risk Control at Bybit Technology Limited ("Bybit"). I have personal knowledge of the facts set forth in this declaration and, if called to testify, could and would testify competently thereto.

2. I submit this declaration in support of Bybit's Motion for a Temporary Restraining Order.

3. In my role as Head of Blockchain Risk Control at Bybit, I am responsible for overseeing all of Bybit's blockchain related risk operations, including blockchain security and incident response. I have been employed at Bybit since 2024. By virtue of my position, I have

personal knowledge of the facts set forth in this declaration, including Bybit's wallet infrastructure, the events of February 21, 2025, and the forensic investigation and recovery efforts that followed.

**Background**

4. Bybit is the operator of one of the world's largest cryptocurrency exchange platforms, serving more than 80 million users worldwide as of the date of this declaration. Since its founding in late 2018, Bybit has grown to become the world's second-largest cryptocurrency exchange by trading volume, with a daily average trading volume of more than $10 billion.

5. Bybit's terms of service create legally binding custodial obligations to each of its users. Under those terms, Bybit holds customer digital assets on behalf of its users and is obligated to safeguard those assets and to return them upon customer demand.

6. To meet its custodial obligations to its customers, Bybit maintains customer cryptocurrency in its own name, as custodian, in a combination of "hot wallets" and "cold wallets." Hot wallets are used for active trading and withdrawals. Cold wallets are used for long-term storage and kept disconnected from networked systems for security purposes. Cold wallets are the highest-security tier of Bybit's infrastructure, requiring multi-party authorization—a process commonly known as "multisig"—before any transfer can be executed. The multisig process is designed to ensure that no single individual can approve a transaction.

7. As of February 21, 2025, Bybit held legal and custodial title to the cryptocurrency in its cold wallets, including the approximately $1.5 billion in Ethereum and Ethereum-based digital assets at issue in this matter. Specifically, the stolen assets comprised approximately 401,347 ETH, 90,375 stETH, 8,000 mETH, 15,000 cmETH, and 90 USDT, amounting to $1.5 billion based on market values at the time of the theft. Although those assets were attributable in

2

part to customer balances, they were held by Bybit under custodial title, and the loss resulting from the theft was Bybit's to bear.

8.    Bybit's cold wallets and the workstations used by Bybit's authorized wallet signers to approve transactions are each computers "used in or affecting interstate or foreign commerce or communication" within the meaning of 18 U.S.C. § 1030(e)(2)(B). Bybit's exchange operates globally and transacts in commerce across international borders on a continuous basis, processing tens of billions of dollars in transactions daily.

9.    On February 21, 2025, Bybit suffered the largest cryptocurrency theft in history when hackers stole approximately $1.5 billion worth of Ethereum (ETH) and Ethereum-based digital assets during what was supposed to be a routine internal transfer of funds from a cold wallet to a warm wallet.

10.    The intrusion that culminated in the February 21, 2025 theft began on or about February 4, 2025, when the attackers compromised the workstation of a software developer at Safe{Wallet} through a social-engineering attack, and used that foothold to gain access to Safe{Wallet}'s cloud infrastructure.

11.    By on or about February 18, 2025, the attackers had reached Safe{Wallet}'s cloud-hosted Amazon Web Services ("AWS") infrastructure. Bybit's forensic investigators determined that the attackers gained unauthorized access to a Safe{Wallet} AWS account and associated API credentials, and used that access to deploy malicious code to the Safe{Wallet} infrastructure on which Bybit's authorized signers relied.

12.    The attackers replaced legitimate JavaScript resources served by the Safe{Wallet} interface with malicious versions specifically designed to activate when Bybit's particular wallets initiated a transaction. Having corrupted the platform that stood between Bybit's signers and its

3

cold wallet, the attackers were positioned to manipulate the transaction-approval process Bybit used to safeguard its assets.

13.     According to company protocol, three Bybit executives were required to digitally approve the February 21, 2025 transaction as a part of the "multisig" security process before the transfer could be executed. However, unbeknownst to Bybit, cyber threat actors had subverted the multisig process.

14.     When Bybit executives approved what appeared to be a routine internal transfer, their screens showed a normal transaction sending funds to the correct destination. But as Bybit later learned, hidden, malicious code caused them to unknowingly approve an unauthorized upgrade of Bybit's cold-wallet smart contract to a malicious implementation contract that the attackers had pre-deployed. The malicious contract contained hidden backdoor functions, which, once triggered, the attackers used to swiftly redirect the $1.5 billion in digital assets to wallets controlled by the Democratic People's Republic of Korea ("DPRK") and the Doe Defendants. The unauthorized transfer was executed in a single coordinated sequence and was complete within minutes.

15.     Following the theft, Bybit worked with third-party cybersecurity firms Sygnia and Verichains to conduct a forensic investigation into the source of the attack. Sygnia specializes in cyber incident response, and Verichains specializes in blockchain and Web3 security. The investigation determined that the attack was carried out through Safe{Wallet}, a third-party software platform Bybit relied on to manage its multisig transactions—a type of attack known as

4

a "supply chain compromise," in which hackers target a trusted vendor or service provider of the ultimate victim.

16. The hackers' actions were all carried out without Bybit's knowledge or authorization, constituting a clear violation of access protocols and effecting a fraud on Bybit and a theft of assets from Bybit and its customers for the financial gain of Lazarus Group and DPRK.

17. As a result of the unauthorized transfer, approximately $1.5 billion in Ethereum and Ethereum-based assets was stolen from Bybit based on market values at the time of the theft.

**Post-Incident Response**

18. In the hours following the February 21, 2025 theft, Bybit faced an extraordinary wave of customer withdrawal demands. Bybit honored more than $4 billion in customer withdrawal requests in the twelve hours following the attack, completing approximately 99.994% of the over 350,000 requests it received in the first ten hours. No Bybit customer lost funds as a result of the attack.

19. To meet that demand and fulfill its custodial obligations, Bybit secured emergency bridge financing of approximately 447,000 ETH from institutional partners including Galaxy Digital, FalconX, and Wintermute. Bybit deployed crisis-management resources across its global operations and suffered the immediate loss of approximately $1.5 billion in customer-attributable assets, which Bybit was forced to absorb to keep its customers whole.

20. An independent proof-of-reserves audit conducted by the cybersecurity firm Hacken confirmed that Bybit's assets exceeded 100% collateralization within a day after the attack, confirming Bybit's solvency and its ability to meet all customer obligations.

21. Bybit also launched the LazarusBounty program, a public-facing initiative offering a recovery pool equal to 10% of recovered funds to incentivize blockchain investigators and the

5

broader cryptocurrency community to assist in tracing and recovering the stolen assets. The program has produced substantial public-source tracing data that complements the work of professional forensic analysts retained by Bybit and the cooperative efforts of law enforcement. To date, Bybit has paid out more than $2.3 million in bounties to blockchain investigators through this program.

**Attributions**

22.     In the aftermath of the hack, Bybit worked closely with law enforcement, particularly the FBI, in investigation efforts and efforts to freeze the stolen digital assets.

23.     On February 26, 2025, the FBI issued IC3 Public Service Announcement 250226 (the "PSA"), publicly attributing the February 21 attack to "TraderTraitor," a cyber threat actor identified by the FBI as a subgroup of the Lazarus Group operating at the direction of the DPRK.

24.     The PSA identified specific blockchain addresses associated with the attack and called on cryptocurrency exchanges, blockchain analytics providers, and the public to assist in tracing and freezing the stolen funds.

25.     This attribution has been independently corroborated by private-sector sources, including the cybersecurity firms retained by Bybit. Based on their respective forensic investigations, Sygnia and Verichains each independently concluded that the hackers' conduct bears the technical hallmarks of Lazarus Group operations and is consistent with the tactics observed in prior DPRK-attributed cryptocurrency thefts.

26.     In addition, one of the cryptocurrency exchanges through which a portion of the stolen funds was routed, confirmed in the course of a law enforcement investigation by the United Arab Emirates that at least eight wallet addresses on the Tron network that were previously identified through forensic tracing as connected to the hack are commonly owned by a single user,

corroborating centralized control of the laundering operation. The Tron network is a decentralized blockchain-based operating system that serves as a platform for cryptocurrency transactions.

27.     Forensic tracing has further identified at least one wallet under Defendants' control that contains both proceeds traceable to the February 21, 2025 Bybit theft and proceeds traceable to a separate January 2025 cryptocurrency theft from Phemex, an unrelated cryptocurrency exchange. The Phemex theft has been publicly attributed to DPRK and Lazarus Group. The presence of both tranches—each individually traceable on the public blockchain ledger—in a single wallet under common control is evidence of a unified DPRK laundering apparatus operating across multiple criminal incidents.

**Tracing the Wallets**

28.     Following the theft, the hackers rapidly converted approximately 86% of the stolen Ethereum and Ethereum-based digital assets into Bitcoin. They further obscured the money trail using cryptocurrency "mixers" (services that blend transactions from many users together to make individual funds untraceable—in this context, akin to money laundering), decentralized exchanges, and cross-chain bridges (tools for moving assets between different blockchain networks).

29.     Forensic tracing has identified several specific laundering vehicles through which Defendants processed the stolen Bybit assets, including, among others: (i) Wasabi, a Bitcoin CoinJoin mixing service; (ii) cross-chain bridge protocols including Chainflip, Debridge, Mayan, Stargate, Garden Finance, Bridgers, and BitTorrent Chain (BTTC), used to convert and move the stolen assets across multiple blockchain networks; and (iii) Railgun, an Ethereum-network privacy protocol used to obscure transaction histories. Defendants' use of this multi-vehicle laundering

7

chain is consistent with established Lazarus Group tradecraft documented by both the U.S. government and independent blockchain forensics firms.

30.     To unravel the obfuscation, Bybit's team of professional blockchain forensic analysts spent the months following the attack working in coordination with law enforcement and Bybit's internal investigations teams to trace the stolen Ethereum and its converted proceeds across the public blockchain ledger. The tracing methodology rests on the public nature of the blockchain ledger. Each transfer of cryptocurrency from one wallet to another is recorded on-chain and is publicly verifiable.

31.     By identifying the wallets that initially received the stolen funds on February 21, 2025, and tracing each subsequent transfer of those funds—including the transfers across blockchains through cross-chain bridges, conversions between cryptocurrencies through decentralized exchanges, and movements through cryptocurrency mixers—the forensic analysts have constructed a comprehensive map of the laundering activity.

32.     The results of this investigation are reflected in Exhibit A to this Motion, which identifies wallet addresses that hold cryptocurrency that is individually attributable, transaction by transaction, to the February 21 theft.

33.     Exhibit A contains four columns. In order from left to right, they are: "Entity, Exchange, or Individual," "Amount," "Coin Type," and "Destination Wallet Address." The last column, Destination Wallet Address, lists wallet addresses presently believed to hold cryptocurrency traceable to the February 21, 2025 theft. The column titled Entity, Exchange, or Individual lists the cryptocurrency exchange or service provider with which each wallet is believed

8

to be held. The Amount and Coin Type columns, read together, list the asset type and amount of stolen cryptocurrency associated with each wallet.

## Law Enforcement Efforts to Preserve

34.    In consultation with Bybit, the federal government and foreign law enforcement authorities have taken preservation action against subsets of the stolen funds. The FBI has obtained one or more seizure warrants under 18 U.S.C. § 981. Taken together, the FBI and foreign law enforcement (including authorities in the United Arab Emirates) have frozen over $35 million in stolen funds that were traced to the Bybit hack. These funds are currently frozen across many crypto companies and exchanges, including Binance, BitMart, Bittime, Bridgers, BTCTurk.com, Chainflip, Changelly, ChangeNow, Circle, Coinbase, Crypto.com, Exness, Gate.io, Heleket, HTX, Kraken, Kanga.exchange, Kucoin, Matrixport, MEXC, N.Exchange, Nexo.io, OKX, Poloniex, Shakepay, ShapeBTC, Swapkit, and Tether.

35.    On April 30, 2025, law enforcement authorities shut down eXch, a cryptocurrency-swapping service that was also used to launder a substantial portion of the assets. Law enforcement seized eXch's server infrastructure and approximately €34 million in crypto assets; however, public reporting indicates that the service continues to facilitate laundering activity following the shutdown. This activity confirms that the stolen funds remain in active circulation through services purpose-built to defeat tracing and to place the assets beyond the reach of legal process. The assets seized in the eXch shutdown included funds traceable to the February 21, 2025 theft, and Bybit has engaged with the relevant foreign law enforcement authorities, who have indicated a willingness to cooperate in the preservation and recovery of those funds.

36.    Bybit has also pursued civil enforcement action in foreign jurisdictions to preserve and recover the stolen assets. In April 2025, Bybit applied to the Court of First Instance of the

9

High Court of the Hong Kong Special Administrative Region and obtained two injunctions restraining unknown persons with access to identified wallet addresses from disposing of cryptocurrency traceable to the February 21, 2025 theft. These proceedings reflect Bybit's active and diligent efforts to exercise all available legal remedies against the Doe Defendants across multiple jurisdictions.

37.    These injunctions were unable to halt the broader laundering scheme because the wallet addresses they targeted represented only a small portion of the total stolen assets. Nevertheless, these injunctions demonstrate Bybit's commitment to deploying civil process wherever available to enforce its rights.

38.    Preservation efforts to date have only captured a small fraction of the $1.5 billion stolen. As of June 2026, only approximately $75.5 million—about 5.3% of the total stolen cryptocurrency—has been frozen or recovered, despite efforts by Bybit, law enforcement, and industry partners.

39.    The remaining assets are more difficult to preserve. Approximately 90.2% of the stolen Bybit assets are currently untraceable due to laundering activities. The remaining 9.8% of the stolen funds (including the 5.3% frozen and 4.5% traced but not yet frozen) have been traced by Bybit and independent forensic analysts to identifiable wallet addresses across multiple blockchain networks. However, the vast majority of those traceable assets are held at exchanges outside the practical reach of U.S. or cooperative-foreign-jurisdiction process. The informal freezes that have been obtained rest substantially on the voluntary cooperation of the holding exchanges. In the absence of a formal court order, those exchanges retain the ability to lift the

10

informal freezes at any time, before any court has adjudicated Bybit's claims. There is no mechanism other than a court order to compel their continued preservation.

40.    Forensic tracing has further identified that a portion of the laundered proceeds was transferred via United States-dollar stablecoins to wallets associated with Iranian sanctioned actors.

41.    The forensic record reflects that the laundering activity has not stopped. Since February 21, 2025, the Doe Defendants have executed thousands of transactions designed to obscure the origin of the stolen funds and to place them beyond the reach of legal process. These transactions include the repeated movement of tranches of the stolen funds, in the period following the theft and continuing through the months preceding this Motion, through cryptocurrency mixers, cross-chain bridges, and swapping services such as eXch. The pattern of activity is sustained and ongoing.

42.    Each time stolen cryptocurrency passes through a mixer, the blockchain forensic trail is materially degraded. While tracing may remain technically possible after a mixing event, it requires substantially greater forensic effort, substantially greater cost, and significantly more time than tracing a transaction that has not been mixed. When stolen cryptocurrency is moved through a cross-chain bridge from Ethereum to another blockchain protocol such as Tron or Bitcoin, additional tracing complexity is introduced, and each transit risks the funds passing into venues where neither U.S. courts nor cooperative foreign authorities have practical reach. If stolen cryptocurrency is exchanged for privacy coins—digital assets engineered to obscure transactional history—the funds may pass beyond the practical reach of any tracing methodology. The ongoing

11

laundering activity therefore causes concrete, incremental, and irreversible harm to Bybit's ability to recover the stolen property.

43.    Without an immediate court order freezing the wallets identified in Exhibit A and listed under "Destination Wallet Address" and directing the exchanges listed under "Entity, Exchange, or Individual" to halt all transfers of the stolen assets, the Doe Defendants will continue their laundering unimpeded, and the remaining traceable funds will be dissipated beyond recovery.

44.    The risk that these funds will disappear is particularly acute now that a complaint has been filed in connection to the February 21, 2025 action. Once the Doe Defendants become aware of this action, they will have every incentive to accelerate their laundering operations.

45.    Freezing the Exhibit A wallets temporarily until there is a resolution is the only way to preserve the stolen assets in their current, traceable state while the Court adjudicates Bybit's claims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 18, 2026.

Alan Xin
_____
Alan Xin

12