**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **BYBIT TECHNOLOGY LIMITED,** <br>     **Plaintiff,** <br><br>     v. <br><br> **DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA, et al.,** <br>     **Defendants.** | **Civil Action No. 26-2173 (JDB)** |

## <u>MEMORANDUM OPINION</u>

This case concerns the largest cryptocurrency theft in history.  In February 2025, North Korean hackers stole $1.5 billion from crypto platform Bybit Technology Limited (Bybit).  Since then, the hackers have been laundering the stolen funds and obfuscating their origin in an effort to eventually put them out of law enforcement and Bybit's reach.  For its part, Bybit has been using forensic tracking to identify the location of the funds in the hopes of getting them back.  Before the Court now is Bybit's motion for an ex parte temporary restraining order (TRO) against certain John Doe defendants and for expedited discovery.

Bybit is entitled to an ex parte TRO.  It has shown a likelihood of success on the merits because defendants engaged in cybercrime and unlawfully converted Bybit's property.  It has established likely irreparable harm absent relief because defendants are continuing their efforts to launder the stolen funds.  And the balance of equities and the public interest weigh in its favor because defendants have no legitimate interest in stolen money and are using the assets to fund nuclear and ballistic weapons programs.  Finally, Bybit is entitled to a TRO without notice to defendants because notice would allow defendants to further dissipate the funds.

1

**<u>Background</u>**[1]

According to Bybit's Head of Blockchain Risk Control, Bybit operates one of the world's largest cryptocurrency exchange platforms, serving over 80 million users globally and facilitating trading volumes averaging more than $10 billion daily.  Decl. of Alan Xin ¶¶ 1, 4, Dkt. 3-2.  Bybit holds customer assets in "hot wallets" used for active trading and withdrawals and "cold wallets" used for long-term storage and improved security.  <u>Id.</u> ¶ 6.  This theft of $1.5 billion in cryptocurrency took place during the transfer from a "cold wallet" to a "warm wallet" (which sits between "cold" and "hot" status in terms of accessibility and security).  <u>Id.</u> ¶ 9.  Specifically, hackers compromised the workstation of a third-party software developer through a social engineering attack, used that access to infiltrate Amazon Web Services' infrastructure, and then manipulated Bybit's multifactor transaction approval process to reroute what looked like a routine internal transfer to the hackers' wallets instead.  <u>Id.</u> ¶¶ 10-14.

Immediately following the attack, Bybit faced over $4 billion in customer withdrawal requests, and Bybit absorbed the $1.5 billion loss so that no customer would lose funds.  <u>Id.</u> ¶¶ 18-19.  Bybit has also paid out over $2.3 million in bounties to blockchain investigators to help trace and recover the stolen assets.  <u>Id.</u> ¶ 21.  Days after the theft, the FBI attributed the cyberattack to a subgroup of the Lazarus Group, a hacking organization working at the direction of the Democratic People's Republic of Korea (North Korea).  <u>Id.</u> ¶ 23.  Private sector cybersecurity firms have also independently concluded that the Lazarus Group was behind the attack, and forensic tracing points to centralized control of the stolen funds and at least one wallet under Lazarus Group control.  <u>Id.</u> ¶¶ 25-27.  To move and launder the funds, the hackers have used

---

[1] Because this is an ex parte motion for a TRO, the only facts and evidence at hand are those provided by Bybit.  Of course, defendants may dispute these facts by submitting evidence of their own after appearing in this case.

cryptocurrency "mixers"—which blend transactions from many users to make individual funds untraceable—as well as decentralized exchanges and bridges between blockchain networks. Id. ¶¶ 28-29. Forensic analysts have traced the transfers of some of the stolen funds to specific crypto wallets. Id. ¶ 30-33; see also Exhibit A, Dkt. 3-3.

Bybit has also been working with U.S. and foreign officials in an effort to preserve and recover the stolen funds. The FBI and foreign law enforcement have frozen over $35 million in stolen assets and shut down one crypto service used for money laundering, and Bybit has pursued civil enforcement actions abroad, but as of today only $75.5 million (5.3 percent of the stolen funds) has been either frozen or recovered. Xin Decl. ¶ 34-38. Over 90 percent of the stolen funds are already untraceable due to laundering, leaving only 4.5 percent that has been traced but not yet frozen. Id. ¶ 39. The traced but not frozen funds are predominantly held at exchanges outside the reach of U.S. or cooperating foreign jurisdictions, and the frozen funds are only frozen informally—exchanges retain the ability to unfreeze funds absent a court order. Id. Defendants' efforts to launder the funds are also ongoing, rendering more stolen funds untraceable or unreachable, and defendants are likely to continue their laundering absent a court order and to accelerate it upon notice of this action. Id. ¶ 41-44.

In its attempt to recover the stolen assets, Bybit has filed suit alleging ten counts: (1) violation of the Computer Fraud and Abuse Act (CFAA), (2) violations of the law of nations through state-sponsored theft and piracy and unlawful expropriation of alien property, (3) violation of the Racketeer Influenced and Corrupt Organizations Act (RICO Act), (4) unjust enrichment, (5) conversion, (6) replevin, (7) trespass to chattels, (8) fraud, (9) tortious interference with contract, and (10) entitlement to a declaratory judgment. Compl. 30-45, Dkt. 1. At this time, Bybit seeks a TRO to restrain the John Doe defendants and anyone acting in active concert or participation with

them from moving the cryptocurrency out of the identified wallets.  Mem. in Supp. of Mot. for TRO & Expedited Discovery 50-51, Dkt. 3-1.  It also asks for authorization to serve expedited subpoenas on the crypto exchanges and other third-party custodians for the wallets at issue to help identify the persons who control those wallets and to trace additional stolen assets.  Id. at 51.  And it seeks authorization to supplement its list of wallets containing stolen funds and to extend the order to cover those wallets.  Id.  Finally, it asks for a show cause order for why a preliminary injunction should not issue against the Doe defendants, with a hearing to be scheduled within 14 days.  Id. at 13.

## Legal Standard

The standard for issuing a TRO is the same as for a preliminary injunction.  E.g., Dellinger v. Bessent, No. 25-5028, 2025 WL 559669, at *3 (D.C. Cir. Feb. 15, 2025).  The moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Courts may also issue a TRO without notice to the adverse party.  Fed. R. Civ. P. 65(b)(1).  An ex parte TRO may issue only if (A) specific facts in an affidavit clearly show irreparable harm will result to the movant before the adverse party can be heard and (B) the movant's attorney certifies in writing any efforts to give notice and the reasons why it should not be required.  Id.  The local rules require either a certificate of counsel or other proof satisfactory to the Court of efforts made by the moving party to provide notice to the adverse party.  Loc. Civ. R. 65.1(a).  And the Court will only consider an ex parte application for a TRO in an emergency.  Id.

**Discussion**

Bybit has shown a likelihood of success on the merits, irreparable injury absent relief, and that the balance of equities and public interest tip in its favor, thereby satisfying its burden for a TRO to issue.

## I.    Likelihood of Success on the Merits

Within this factor, courts must consider threshold issues such as jurisdiction and cause of action as well as the underlying merits.  The Court will take several issues in turn.

Generally, foreign states such as North Korea are immune from suit in American courts, although the Foreign Sovereign Immunities Act sets out several exceptions to that immunity. Stabil LLC v. Russian Federation, 167 F.4th 506, 517 (D.C. Cir. 2026).  Satisfying one of those exceptions is required to establish subject matter jurisdiction over a foreign state in a U.S. court. Id. at 518.  Bybit asserts that at least one of two exceptions are met here: for commercial activity and for property taken in violation of international law.  Mem. in Supp. 9 (citing 28 U.S.C. § 1605(a)(2), (3)).  The Court agrees.

As an initial matter, the Court finds that the actions of the Lazarus Group in stealing this cryptocurrency are likely attributable to North Korea under customary international law because the U.S. government has identified the Lazarus Group as part of North Korea's intelligence services.  See Mem. in Supp. 7-8, 17; Compl. ¶ 33; Xin Decl. ¶ 23.  Bybit then argues that this hack was an act overseas in connection with commercial activity of North Korea abroad—crypto transactions—that caused a direct effect in the United States, including by disrupting U.S. crypto

markets, undermining U.S. sanctions enforcement, and using U.S. crypto exchanges for money laundering.  See Compl. ¶¶ 30-32 (citing 28 U.S.C. § 1605(a)(2)).[2]

Indeed, Bybit is based in Dubai, Compl. ¶ 20, at least some of the cryptocurrency exchanges through which the funds were subsequently moved are based abroad, see id. ¶ 14 (stating that, on information and belief, a "portion" of the proceeds have been or will be laundered through U.S. crypto exchanges), and North Korean hackers are very likely based abroad.  The Supreme Court has also made clear "a state engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993) (citation modified).  In this Court's view, the cryptocurrency transactions that immediately followed the hack and continue until today are "the type of actions by which a private party engages in trade and traffic or commerce." Id. at 360-61 (citation modified).  Moreover, Nelson recognized that the third clause of 28 U.S.C. § 1605(a)(2)—requiring an act "in connection with" commercial activity—is a lower standard than the first clause at issue in that case—requiring an act "based upon" commercial activity.  Id. at 358; see also Azima v. RAK Inv. Auth., 305 F. Supp. 3d 149, 165-67 (D.D.C. 2018) (Brown Jackson, J.) (explaining that there must be a "substantive connection or causal link" to the commercial activity rather than "mere tangential or attenuated connection"), rev'd on other grounds, 926 F.3d 870 (D.C. Cir. 2019).  And the Court agrees on the record before it so far that this hack had a direct effect in the United States.

---

[2] The Court therefore need not reach Bybit's assertion that North Korea has unlawfully expropriated alien property and conducted state-sponsored piracy.  Compl. ¶ 33 (citing 28 U.S.C. § 1605(a)(3)).  The Court also notes that Bybit only seeks an ex parte TRO as to the Doe defendants.  Mem. in Supp. 10 n.1.  However, its asserted bases for federal question jurisdiction appear to require predicate acts by the state-sponsored Lazarus Group acting at the direction of North Korea and its intelligence services, id. at 21 (citing the CFAA and RICO Act), so subject matter jurisdiction over those entities remains implicated.  Bybit might independently have diversity jurisdiction over the Doe defendants as to its state law claims, depending on their citizenship.  See 28 U.S.C. § 1332.

Venue is proper in this District because North Korea is a foreign state. 28 U.S.C. § 1391(f)(4). Bybit also has a cause of action under the CFAA, which provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

On the merits of that claim, Bybit must show that defendants (1) knowingly and with intent to defraud, (2) accessed a protected computer without authorization, (3) by means of that conduct furthered the intended fraud, and (4) obtained anything of value. 18 U.S.C. § 1030(a)(4). A protected computer includes any computer "used in or affecting interstate or foreign commerce or communication." Id. § 1030(e)(2)(B). According to the as yet undisputed facts, the Doe defendants engaged in a coordinated and unauthorized intrusion into Bybit's cold-wallet authorization system, including through computers used to transact international business, deploying malicious code to fraudulently extract $1.5 billion without permission. See Xin Decl. ¶¶ 8-17. That demonstrates a likelihood of success on the CFAA claim at this preliminary stage.

Other courts granting ex parte TROs in crypto theft cases have found a likelihood of success on conversion claims, so this Court will briefly address that claim as well. See Jacobo v. Doe, Civ. A. No. 1:22-672, 2022 WL 2052637, at *4 (E.D. Cal. June 7, 2022); Yogaratnam v. Dubois, Civ A. No. 24-393, 2024 WL 758387, at *4 (E.D. La. Feb. 23, 2024); Legacy Invs. Holdings, LLC v. Does 1-20, Civ. A. No. 25-8800, 2025 WL 2988640, at *2 (N.D. Cal. Oct. 23, 2025). Under D.C. law, conversion is the "unlawful exercise of ownership, dominion, and control over the personalty of another in denial or repudiation of his right to such property." Papageorge v. Zucker, 169 A.3d 861, 864 (D.C. 2017) (quotation omitted). Money can be the subject of a conversion claim "if the plaintiff has the right to a specific identifiable fund of money." Id.

(quotation omitted).  Here, each crypto token transferred from Bybit's cold wallet is identifiable on the blockchain, see United States v. Harmon, 474 F. Supp. 3d 76, 81-82 (D.D.C. 2020), so Bybit has the right to these specific funds.  And the Doe defendants exercise dominion over these funds unlawfully.

Accordingly, the Court concludes that Bybit has shown a likelihood of success on the merits of its claims.[3]

## II.    Irreparable Injury

Bybit has also carried its burden to demonstrate a likelihood of irreparable injury absent relief.  As numerous courts have recognized, the speed with which cryptocurrency moves, the anonymous nature of the Doe defendants, and the apparent efforts to launder and put out of reach the stolen funds creates a significant risk of irreparable dissipation absent preliminary relief.  E.g., Legacy Invs., 2025 WL 2988640, at *2 (citing Jacobo, 2022 WL 2052637, at *5 (collecting cases)); Yogaratnam, 2024 WL 758387, at *4 n.39 (collecting cases).  To be sure, monetary loss generally is not considered irreparable because it can be compensated through money damages.  E.g., Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).  But here the defendants are an anonymous group of hackers and a rogue nation, so it is unclear at best whether Bybit would have any hope of recovery through money damages if this particular cryptocurrency is dissipated.  See Mem. in Supp. 36.  Moreover, Bybit requests not simply legal damages but also the imposition of a constructive trust over the identified crypto assets to enable restitution and disgorgement of those assets.  Id. at 28; see also Jacobo, 2022 WL 2052637, at *5 (finding that plaintiff's request for a constructive trust weighed in favor of irreparable injury).

---

[3] The Court need not address Bybit's other claims because it finds that Bybit has a likelihood of success on the merits as to these two claims.

Therefore, the Court finds that Bybit has carried its burden as to irreparable injury.

### III.   Balance of the Equities and Public Interest

Next, the Court must consider the effect on each party and the public from granting or denying preliminary relief.  Again, the Court finds illuminating and persuasive the approaches taken by its sister courts.  See Legacy Invs., 2025 WL 2988640, at *2; Yogaratnam, 2024 WL 758387, at *4; Jacobo, 2022 WL 2052637, at *5-6.  This temporary freeze on Doe defendants' assets minimally prejudices them, whereas denying relief could irreparably harm Bybit through the risk of dissipation.  And the Court has already found that defendants likely have no right to the assets in any event.

The Court also agrees with Bybit that the public interest tips sharply against defendants. According to the as yet undisputed facts, the assets at issue are proceeds from a massive theft, which undermined the integrity of crypto markets and was carried out at the direction of a sanctioned government to fund nuclear and ballistic weapons programs.  See Mem. in Supp. 38-40; Compl. ¶ 87 (asserting that U.S. government officials, the U.S. Treasury, and United Nations reports state that North Korea uses cryptocurrency theft operations to fund its nuclear and ballistic missile programs).  There is no discernable public interest that cuts against preliminary relief.

* * *

For the foregoing reasons, the Winter factors all favor issuing a TRO, and so the Court will next turn to the form and scope of relief.

### IV.   Notice

Recall that a TRO generally may issue without notice only where specific facts clearly show that irreparable injury would result to the movant from notice and the movant's attorney certifies in writing why notice should not be required.  Fed. R. Civ. P. 65(b)(1); see also Loc. Civ.

9

R. 65.1(a).  Here, Bybit has already carried its burden as to irreparable injury for the reasons explained above.  Bybit also asserts that it filed a certificate of counsel under Local Rule 65.1, Mem. in Supp. 42, although the Court does not have that filing before it.  Because this motion came outside business hours on a holiday, the Court cannot readily verify whether the certificate was indeed filed.  But the Local Rules also permit "other proof satisfactory to the Court."  Loc. Civ. R. 65.1(a).  The Court is satisfied that notice would risk dissipation of the funds such that an ex parte TRO is warranted.  See Xin Decl. ¶ 44.[4]

### V.   Discovery

Courts have the discretion to allow expedited discovery.  See Fed. R. Civ. P. 26(d)(1); Warner Bros. Recs. v. Does 1-6, 527 F. Supp. 2d 1, 2 (D.D.C. 2007).  Typically, courts consider whether expedited discovery is reasonable based on "all of the surrounding circumstances," including: "(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made."  Guttenberg v. Emery, 26 F. Supp. 3d 88, 98 (D.D.C. 2014).

Here, Bybit requests information related to the identities of the Doe defendants from the cryptocurrency exchanges and third party custodians identified in Exhibit A in order to amend its complaint to name them and effectuate proper service of process.  It also asks for transaction records and balance information from the cryptocurrency addresses that it identifies to track the current location of traceable stolen assets before they are moved beyond reach.  The Court grants both requests.

---

[4] The Court will also not require a bond under Federal Rule of Civil Procedure 65(c) because it is unclear what harm if any defendants may suffer from this temporary freeze of assets to which they likely have no entitlement. E.g., Legacy Invs., 2025 WL 2988640, at *3 (same).

"In cases involving as-yet-unknown defendants, in which the plaintiff cannot serve its complaint—much less confer with the defendant—without obtaining identifying information from a third party, the only potential avenue for discovery is a court order under Rule 26(d)(1)." Strike 3 Holdings, LLC v. Doe, 964 F.3d 1203, 1207 (D.C. Cir. 2020) (citation modified).  Accordingly, the court need only "determine whether the plaintiff should have the opportunity to name that defendant in the first place." Id. at 1210.

The Court finds that expedited discovery is warranted for the information related to the identities of the Doe defendants.  Bybit has used forensic accounting to trace stolen cryptocurrency, thereby identifying the accounts in question.  Discovery is necessary for Bybit to identify the owners of those accounts and facilitate service of this action upon them.  Because the exchanges are required to collect identifying information from their customers, the identities of the Doe defendants are likely ascertainable and the request is not overly burdensome.  And as the Court has already concluded, Bybit has brought claims that are likely to succeed on the merits.  Therefore, expedited discovery is warranted to enable Bybit to identify the Doe defendants.

The Court also finds that expedited discovery is warranted for the information related to transaction records and balances.  This information is also relevant to the preliminary injunction relief that Bybit seeks because Bybit desires to enjoin the Doe defendants from transferring any funds connected to the theft, not merely the funds in the thus-far identified wallets.  Ascertaining other wallets where funds have been moved is thus paramount to ensuring that an injunction carries effect.  Because this information is kept in ordinary-course records held by the cryptocurrency exchanges, the request is not overly burdensome. And because Bybit is likely to succeed on the

11

merits of its complaint, it is reasonable to infer that the Doe defendants will attempt to move assets in yet-unidentified wallets if given that opportunity.[5]

## **Conclusion**

For the foregoing reasons, the Court will grant plaintiff's motion for an ex parte TRO and for expedited discovery.  A separate order will accompany this opinion.

/s/ \
JOHN D. BATES \
United States District Judge

Date: June 19, 2026

---

[5] The Court will not at this time take action on the motion to show cause why a preliminary injunction should not issue.